CORNELIUS D. CURNEN, Respondent, *v.* JOHN J. RYAN, Defendant, Impleaded with INTERNATIONAL SHIPBUILDING AND MARINE ENGINEERING CORPORATION, Appellant.

Second Department, March 14, 1919.

Partnership — assignment by partner of contract with government for construction of boats without knowledge of copartner — said contract a chose in action — suit to impress trust upon contract — when said copartner not estopped from questioning assignment.

In a suit to impress a trust upon a certain contract between the United States government and the defendant company for the construction of boats, it appeared that the plaintiff and the individual defendant, a man of experience in boatbuilding and designing, had entered into a written agreement by which the plaintiff was to pay the necessary expenses of securing a contract for furnishing boats to foreign governments, which agreement was to cover " all other orders or contracts for boats." It was agreed that the plaintiff and the individual defendant were " to share and share alike in all profits derived from the sale and manufacturing of said boats." The plaintiff was to be president and treasurer of any corporation to be formed but the individual defendant was to have charge of the building and designing. It was also agreed that any money advanced by the plaintiff in connection with the boat business was to be refunded by the corporation or company if one was formed, or the defendant personally was to repay one-half of said moneys advanced. The bid for the contract in question was prepared by the plaintiff and the

individual defendant and signed in the name of the company which was not incorporated, per said defendant as general manager and was delivered and deposited by the plaintiff. Thereafter said defendant, without plaintiff's knowledge, entered into negotiations with other investors resulting in the incorporation of the defendant corporation under the identical name used by the plaintiff and himself in making the bid, save that the word " corporation " was substituted for " company." The plaintiff was informed on May twelfth of the sale of the contract and upon July twenty-seventh commenced this suit in which he demands judgment for the money advanced and a decree that he is the owner of a one-half interest in the contract now claimed by the defendant corporation and one-half of the profits derived therefrom, and asks for an accounting and that the profits be impressed with a trust in his favor and that a receiver be appointed.

*Held*, that the contract was a chose in action and that since the plaintiff never authorized the individual defendant to sell or assign the same, he could not transfer a greater interest than he himself possessed;

That since the plaintiff's failure to protest or object between the date of the discovery of the sale of the contract and the date of the commencement of his suit did not injure or influence the defendants in their dealings in any way, said plaintiff is not estopped from questioning the sale.

MILLS, J., and JENKS, P. J., dissented, with opinion.

APPEAL by the defendant, International Shipbuilding and Marine Engineering Corporation, from a judgment of the Supreme Court in favor of the plaintiff, entered in the office of the clerk of the county of Rockland on the 28th day of May, 1918, upon the decision of the court after a trial at the Rockland Special Term.

The judgment decreed that plaintiff is entitled to one-half of the net profits arising from a shipbuilding contract between the United States government and the appellant, and directed an accounting to ascertain the amount of said profits.

The plaintiff brought this suit in equity to impress a trust upon a certain contract dated April 16, 1917, between the United States government and the International Shipbuilding and Marine Engineering Company (hereinafter referred to as the company) for the construction of ten boats known as " submarine chasers," which contract the defendant corporation claimed to own and which was being performed by said defendant at the time the suit was commenced. The contract was made pursuant to a bid submitted to the Navy Department by the company on March 31, 1917, in response to a

public invitation for bids. The bid of the company was accepted on April 6, 1917, and notice of the acceptance and award of the contract sent to said company at its office in New York city. The company was not incorporated, but was a name used by the plaintiff and the defendant Ryan. The bid which was prepared by the plaintiff and Ryan was signed " International Shipbuilding and Marine Engineering Company, Per John J. Ryan, Gen'l. Mgr.," and was taken to Washington by the plaintiff and deposited with the Navy Department. Certain alterations being necessary, it was withdrawn, the alterations were made by the plaintiff and the bid was again received by the Navy Department and the award thereafter made. The plaintiff and Ryan had entered into a written agreement in December, 1916, by which plaintiff agreed to finance all expenses necessary, to the amount of $5,000, leading up to securing a contract for furnishing coast defense or anti-submarine boats to the Canadian or British governments, which was the original object of the parties, the agreement containing a provision: " This agreement is also to cover all other orders or contracts for boats of any description whatsoever or any other company or corporation that will be formed for boat building or any other business in connection with boats." It was agreed that plaintiff and Ryan " are to share and share alike in all profits derived from the sale and manufacturing of said boats.' The plaintiff was to be president and treasurer of any corporation to be formed for the building of the boats, but Ryan, who had experience in boatbuilding, was to have charge of the building and designing. It was also agreed that any money advanced by the plaintiff in connection with the boat business was to be refunded by the corporation or company if one was formed, or Ryan personally should repay one-half of said moneys advanced. The trial judge in his findings of fact has found that, relying upon Ryan's representations that he was a boat designer and builder of large experience, and that contracts for government boatbuilding could be obtained which would be very profitable, the plaintiff advanced large sums of money to Ryan, and prior to the award of the contract for the ten submarine chasers which is the subject of this action, plaintiff had paid the expenses of trips to Canada, and later to

England, on which he accompanied Ryan in an unsuccessful effort to obtain British contracts. The plaintiff claimed to have advanced $11,500 for expenses prior to the award of the United States contract in April, 1917, which amount was questioned by Ryan. The trial judge found that the advances were upwards of $5,525, none of which had been repaid. The bid accepted by the United States government and embodied in the contracts was for ten boats for which the government was to pay a total cost of $462,000. The estimated or actual cost of construction, plant, etc., prepared by Ryan indicated a large profit from the performance of the contract. The trial court found that after the award of the contract, the plaintiff and Ryan at once proceeded to obtain a yard and plant at which to build the boats, visited various localities, and plaintiff examined a boatbuilding plant at Nyack, N. Y., and reported to Ryan that it was a suitable location. The trial judge also found that after these inspections the plaintiff and Ryan agreed to form a corporation in accordance with their contract of December, 1916, to construct the boats, that the plaintiff was at all times ready and willing to perform all the conditions of the contract between him and Ryan and to finance and carry out the contract with the United States government, and that plaintiff at no time abandoned the enterprise.

Without plaintiff's knowledge, and during the period in which plaintiff was examining proposed plants and engaged in other work preliminary to the actual execution of the contract and the commencement of building operations, Ryan opened negotiations with one Felix Isman to obtain an advance of money on the contract awarded to the company by the government, and on April 7, 1917, received $1,500 cash from Isman on an agreement by which he promised to turn over the contract to a corporation to be formed by Isman under the same name as the company, which Ryan represented to be himself. The corporation was to have a capital stock of $3,000,000, of which $1,000,000 was to be preferred and $2,000,000 common stock, Ryan to have at all times forty-nine per cent of the common stock and to be employed by the new company at a salary of $100 per week. On April, 21, 1917, still without plaintiff's knowledge, Ryan entered

into an agreement with one Pope and with certain Canadian investors, by which he agreed to turn over the contract to them or to a corporation to be organized by them with a capital stock of $1,500,000, Ryan to receive practically all of the stock in consideration of turning over the contract, but returning seventy-five per cent thereof to the Canadians, retaining twenty-five per cent for himself out of which he was to obtain a release of any interest possessed by Isman or Pope. In his dealings with the Canadians Ryan represented to them that he was the sole owner of the award and that no one else was interested therein save Isman and Pope. The Canadians thereupon incorporated the defendant International Shipbuilding and Marine Engineering Corporation, which, it will be noted, is the identical name used by the plaintiff and Ryan in making the bid, save that the word " corporation " is substituted for " company," and at once proceeded to obtain the surety bond required by the government before the contract could be executed. The plaintiff testified that he had arranged for a surety bond prior to the time he discovered Ryan's transactions. The Canadians procured this surety bond, ·which guaranteed performance by the " company," not by the corporation defendant, and immediately proceeded to Washington with Ryan and signed the contract in the name of the " company," not the corporation. They purchased the plant at Nyack for $50,000 cash and at once commenced the construction of the ten submarine chasers.

The trial judge found that the agreement between Ryan and Isman, and the subsequent transfer of the contract to the Canadian investors and to the defendant corporation, were in fraud of the plaintiff's rights and to defraud plaintiff of his rights under the contract.

The learned trial judge has also found as matter of fact that at the time of the formation of the defendant corporation and the issuance of stock and payment for the plant, the Canadians had no knowledge that plaintiff had any interest in the award, and that prior to such incorporation they made inquiries of Ryan and Pope and were informed that no one else was interested in the award save Ryan, Pope and Isman. He also found as a conclusion of law that the defendant corpo-

ration purchased the award in good faith for a valuable consideration and without notice of plaintiff's claim.

But the learned trial judge held that the contract was a chose in action and the defendant corporation took the assignment thereof subject to plaintiff's interest and equity therein; that the plaintiff had not authorized Ryan to dispose of the contract, nor was plaintiff estopped from denying Ryan's authority.

The organization of the defendant corporation, the signing of the contract at Washington, the transfer of the award, the purchase of the Nyack plant and commencement of building operations appear to have been carried on with celerity, being accomplished within comparatively few days from the time when the Canadians say they first heard of the award from Pope. The plaintiff, who was in Washington during the transactions in question, returned to New York on May 5, 1917, and on May 12, 1917, was informed by Ryan of the sale of the contract to the Canadians. It appears that a quarrel took place between the plaintiff and Ryan, the plaintiff demanding a return of the money which he had advanced, and to which he was entitled under his agreement with Ryan of December, 1916, irrespective of his one-half interest in the profits of the enterprise. A controversy ensued over the amount due from Ryan to the plaintiff for such advance. On June 1, 1917, Ryan wrote the plaintiff offering him $30,000 in stock of the corporation " for past favors." Plaintiff refused the " gift " and on June fourteenth Ryan wrote plaintiff that as he threatened litigation he would realize that he would have to take time if he brought suit. Plaintiff insisted that he had advanced $11,180. Ryan on June 22, 1917, offered him $4,500, which plaintiff refused, and on July twenty-seventh began this suit in which he demands judgment for $5,535 advanced and a decree that he is the owner of a one-half interest in the contract between the United Statesgo vernment and the International Shipbuilding and Marine Engineering Company now claimed by the defendant corporation, and one-half of the profits derived therefrom. He prays for an accounting by the defendant corporation and that the proceeds and profits be impressed with a trust in his favor for one-half thereof and that a receiver be appointed.

The action was commenced on July 27, 1917, and the trial judge finds that this was the first time the plaintiff asserted a claim against the defendant corporation.

Upon the trial of the action the learned trial judge stated that he would first decide whether the plaintiff made out a case to show whether he had any right to share in the profits of the defendant corporation. This he referred to as the main issue. He said: " I think we should try and determine first the question of the plaintiff's interest in the contract. If he has none, there is nothing further, and if he has an interest that is established by the judgment, then I think he should take an independent action and proceed for a receivership. I don't think it ought to be asked for now until it is determined whether he has an interest or not." To which plaintiff's counsel replied: " You don't think we would have to start another action? " and the judge answered: " I don't say that you will have to, but I think it would be advisable to. * * * I think we had better clean up the first question and determine whether the plaintiff has an interest, and then, if the plaintiff gets a judgment here establishing an interest in this business he can take whatever proceedings are best to protect that interest in the business, either by application for a receivership or proceeding to dissolve the corporation or whatever may be advisable."

The case proceeded upon that theory and judgment was rendered for the plaintiff, establishing his interest in the contract for the construction of the ten submarine chasers. The court decreed that the plaintiff and defendant Ryan being co-adventurers in procuring the contract and being equally interested therein, Ryan with intent to defraud plaintiff assigned the contract first to Isman and later to the defendant corporation; that such assignments were without plaintiff's knowledge or consent and in fraud of his rights; that the contract was a chose in action and that the defendant corporation took the assignment thereof subject to the plaintiff's interests and equity therein. The judgment further decreed that the plaintiff is the owner of a one-half interest in the contract and was entitled to an accounting as to the value of said one-half interest. The court found that plaintiff had no interest in the shipbuilding plant of the defendant

corporation at Nyack and no interest in any other contract of the defendant corporation, and as a conclusion of law that the plaintiff's interest in the contract specified is in the net profits of said contract, if any, after proper allowances have been made for expenses for the use of the plant, interest on working capital, premium on bond and all other necessary and proper expenses in the construction of said vessels. The findings and judgment as entered award no specific relief as against defendant Ryan except the costs of the action. Ryan does not appeal.

*E. Crosby Kindleberger* [*Hamilton Rogers* with him on the brief], for the appellant.

*E. W. Hofstatter*, for the respondent.

KELLY, J.:

We are all agreed that the learned trial justice was right in his ruling that the contract was a chose in action, and that Ryan could not transfer a greater interest in it than he himself possessed, unless as between plaintiff and himself he had authority to dispose of it. And if he had no such authority, the question would still remain whether the plaintiff by his conduct or laches is estopped from questioning the sale to the Canadians. We are also agreed that if the plaintiff is entitled to recover, his interest would be in the net profits, if any, of the contract for the ten submarine chasers after proper allowances have been made for expenses for the use of the plant, interest on working capital, premium on bond and all other necessary and proper expenses in the construction of the vessels. The judgment appealed from establishes plaintiff's ownership of one-half interest in the contract and his right to one-half of such net profits.

My brethren who dissent from the affirmance of the judgment are of opinion that upon the evidence the plaintiff cannot, as against the Canadians represented by the defendant corporation appellant, question Ryan's right to sell the contract, and that plaintiff omitted to promptly disavow Ryan's acts on learning of his assignment or sale of the award and contract. This is the point of difference between us.

The learned trial justice has found as matter of fact that

the Canadian investors in dealing with Ryan acted in good faith and without knowledge of plaintiff's interest in the transaction. The respondent urges that the evidence shows the contrary, or at least lack of the ordinary precautions to be taken where one is purchasing property title to which upon the face of things is not in the vendor, and he asks this court to make new findings holding the defendant corporation chargeable with knowledge of plaintiff's rights and equities. If this were an original question with us, we might have some difficulty in approving of the business methods of the purchasers of the contract. The remarkable haste with which the purchase was consummated, the fact that on its face the award had been made to the company of which Ryan was simply general manager, the use of the name of the company by the purchasers in making the contract, these and other matters in evidence would seem to call for investigation and inquiry from some one other than the man who was selling what apparently did not belong to him. The general manager of a corporation has no such plenary power to sell out its entire property and assets as would avoid the necessity of the purchasers inquiring as to who was really interested in the company, and such inquiries should not have been made solely of the general manager and his colleague Pope. Slight inquiry, whether at the office of the so-called company in New York city, or even at the Navy Department where the plaintiff personally had actually submitted the bid on introductions from high governmental officials, would have at once disclosed his interest. It is not enough to say that they " did not know," if they should have known, nor should they justify their lack of knowledge by omitting to make inquiries any reasonable man would have made or by relying upon statements made by the very people who were selling them property marked plainly as belonging to someone else. But the respondent did not except to the findings of the learned trial justice in these particulars, nor has he appealed therefrom, and he cannot question them here. (*Cox* v. *Stokes,* 156 N. Y. 491, 504; *Brown* v. *Robinson,* 173 App. Div. 583.)

I cannot find any evidence that the plaintiff ever authorized Ryan to sell or assign the award and contract. The trial judge has found that Ryan acted without the knowledge

and consent of the plaintiff and with intent to defraud him. Ryan appears to have been a man of varied experiences, but the evidence shows that he was a boatbuilder, had constructed boats which may not have been as large as those desired by the government, but were of the same general character as fast motor boats. He was interested in a boatbuilding plant near Detroit, and there is no doubt on the evidence that the plaintiff relied upon his ability as a boatbuilder. He had undertaken to build boats for the Canadian government and plaintiff had accompanied him to England. They had dealt with naval authorities and shipbuilders and had exhibited their plans and blueprints and there is no suggestion in the record that his competency was questioned. Even the defendant corporation agreed to pay him a salary of $7,500 a year for his services in securing business and aiding and assisting them in designing and building boats. Nor was the bid made and the award of the contract obtained with the purpose of selling it. Immediately upon receiving notice of the award the plaintiff and Ryan set about procuring a plant. The approval of the naval authorities was obtained first for a plant at Detroit and later at Nyack. Before Ryan's first lapse from fair dealing with plaintiff they were discussing the advance in price of material and Ryan testified that he had actually ordered material which was being loaded at Hillside, Miss., billed to Marine City, Mich. He testified that he had actually commenced work at the latter place for which governmental approval had been obtained, and was disturbed at the difficulty in bringing the completed boats to tidewater at New York, afterwards obviated by the selection of the yard at Nyack, N. Y. The plaintiff appears to have been in earnest on his part. He had visited the surety company to arrange for the necessary bond upon the contract, and it was the plaintiff who visited and examined the Nyack shipyard, reporting his approval to Ryan. There appears to be ample evidence to sustain the finding of the trial justice that the plaintiff was at all times ready and willing to finance and carry out the contract with the government, to perform all the conditions of his contract with Ryan and that he at no time abandoned the enterprise. It will not do to call him an adventurer, in the offensive sense. I think the evidence

Second Department, March, 1919. [Vol. 187.

shows that at the outset Ryan intended to carry out his agreement with plaintiff, and it was not until after his personal necessities brought him into contact with the financial gentlemen, Messrs. Isman and Pope, and the Canadian investors, that he suffered himself to be led astray. So far as his twenty-five per cent stock interest in the defendant corporation was concerned, half of it immediately went to Isman and Pope, the remaining twelve and one-half per cent being put in pawn or as collateral for a loan of $5,000 obtained from a New York gentleman named Considine, from whom the Canadians subsequently purchased it. It would appear that the plaintiff cannot be charged with any lack of good faith. Indeed, it is evident that while he may not have had experience in shipbuilding, his individual introduction to the naval authorities in Washington, and his individual correction and deposit of the bid were important factors in the acceptance of the bid and the award of the contract. There is no evidence in the record that he had any idea or intimation of any sort that Ryan was attempting to sell him out.

It is suggested that he is in some way estopped from questioning the sale to the Canadians because when he first learned of Ryan's duplicity about May 12, 1917, he did not at once notify the Canadians of his claim. But the sale was then an accomplished thing. He had in no way induced the Canadians to deal with Ryan. They say they never knew, him or heard of him. He at once demanded from Ryan the money which he had advanced and to which he was entitled under his agreement irrespective of his interest in the profits arising from the profits of the enterprise. He refused Ryan's offer of $30,000 in stock of the defendant company as a gift for "past favors." He rendered statements of his advances and afterwards itemized them, but he could not collect anything and finally consulted counsel and this action was commenced late in July. I cannot see how anything he did or omitted to do prejudiced the defendant corporation or its managers. They had purchased the award and contract, signed the papers, incorporated the company, expended $50,000 in cash for the Nyack shipyard and deposited $100,000 for working capital, all on May second or third. They had at once commenced work on the boats. It is hard to see

how any announcement by the plaintiff of his rights and claims after May twelfth would have affected them. They had taken an assignment of an award made to " International Shipbuilding and Marine Engineering Co., World's Tower," without any mention of Ryan's name, and had executed a contract with the government in the name of that company described as of " World's Tower Bldg., West 40th St., of New York," Mr. Tanguay signing as president and Mr. Forward as secretary, although neither of them was an officer of the company which in fact had no legal existence. They had procured the Globe Indemnity Company to act as surety for them on that contract. If there was necessity for signature of a president and secretary to the contract, it would seem as though some proper inquiry should have been made as to the authority of Mr. Ryan as " general manager " to turn over the contract to them. But the point of all this is that it is evident that the plaintiff's failure to protest or object between May twelfth and the date of the commencement of his lawsuit, cannot have injured them or influenced them in their dealings in any way. They did nothing and omitted nothing because of plaintiff's silence, and we know that after suit was commenced they acquired Mr. Ryan's stock from his friend Mr. Considine. So that, conceding the proposition that in the absence of estoppel the assignor of a chose in action cannot transfer to the assignee, even though a purchaser for value without notice, any greater title than the assignor possesses, I cannot find any estoppel as against the plaintiff here.

It is impossible to tell upon the record before us what profit may have resulted from this contract, or whether there was any profit, but upon the evidence the judgment rendered at the Special Term appears to be right and should be affirmed.

RICH and PUTNAM, JJ., concurred; MILLS, J., read for reversal, with whom JENKS, P. J., concurred.

MILLS, J. (dissenting):

The crucial question here is whether or not Ryan as against Curnen had authority to sell the award to the Canadian

capitalists — either directly or impliedly through some form of estoppel. If he had no such authority, then I think, barring any question of laches, plaintiff Curnen could in equity seek and gain the relief which by the judgment has been awarded to him. I think that the undisputed facts and the inferences fairly to be drawn from them answer the above inquiry in the affirmative. This I conclude for the following reasons, viz.:

(a) The award, according to the finding, was really in the name of Ryan, viz.: "International Shipbuilding and Marine Engineering Company, John J. Ryan, by John J. Ryan, Manager." There was no such corporation. The bid, therefore, was really in form by Ryan, and the award was really to him. If Curnen was, as found, a half owner of it with Ryan, he, Curnen, suffered the Canadians to deal with Ryan as sole owner and, therefore, should be held estopped from disputing as to them Ryan's authority to deal with them as such, inasmuch as they did so deal with him in entire good faith.

(b) It is evident that the two, Curnen and Ryan, in the matter of the bid and award were co-adventurers; that neither had the capital to carry out the proposed work, and that their real purpose was to dispose of the award. It was, therefore, within the obvious scheme of their copartnership to dispose of the award outright, or at least for a part of the stock of the corporation which capitalists might form to do the work under the award. Hence Ryan had real authority from Curnen to dispose of the award as he did for an interest in the working corporation formed by the Canadian capitalists. The telegram by plaintiff to Ryan of April 9, 1917, fairly implies that Curnen realized that Ryan could then in Detroit make valid such deal and, therefore, deemed it necessary to specially stop him from so doing until he, Curnen, had a chance to submit a proposition which he was attempting to negotiate. Moreover, it is evident that when Curnen first learned of the deal actually made by Ryan with the Canadians, he did not repudiate Ryan's authority to make it, but merely complained, in effect, that Ryan was not giving him his share, viz., that " he [Curnen] had been given a rotten dirty deal;" and the break between them evidently came from Ryan's

disputing the amount due from him to Curnen for moneys advanced or loaned. From the facts in reference to this phase of the matter as found, it is evident that from May 5, 1917, when Curnen became fully advised of the deal made by Ryan, to July 27, 1917, when this action was commenced, Curnen made no claim against the Canadians or their corporation, but made his claim merely against Ryan personally. Meanwhile, evidently the corporation was proceeding with the execution of the contract and completed some of the submarine chasers.

My conclusion, therefore, is that Curnen is bound by the contract made by Ryan with the Canadians and their corporation: (a) Because such a deal was within the real authority of Ryan as co-adventurer with Curnen; (b) because it was certainly within the apparent such authority of Ryan, i. e., within the appearances with which Curnen had clothed him and upon which the Canadians in good faith acted; and (c) because Curnen did not at once, upon being informed of the deal, repudiate to the Canadians and their corporation Ryan's such authority, but suffered them to go on with their expenditures and work upon the faith of such authority. In short, the situation appears to be this, that the two adventurers (here using the term in the other and dubious sense), having entered into a scheme to exploit the government, and to that end taken an award which they were utterly incapable of carrying out, did by one of them sell it for a substantial price to the Canadian capitalists and then quarreled among themselves as to the division of that price, and after, through such quarrel, Ryan, who had received the whole price, had made away with it, then the other one, Curnen, made claim upon the Canadians. To my mind there is no merit, legal or equitable, in such claim.

Therefore, while I appreciate the great care which Mr. Justice KELLY has exercised in considering the appeal and preparing his opinion, I feel constrained to dissent therefrom.

JENKS, P. J., concurred.

Judgment affirmed, with costs.