T. P. GORDON, RESPONDENT, v. WELLES ANDREWS, APPELLANT.*

Kansas City Court of Appeals. December 5, 1927.

*Corpus Juris-Cyc References: Agency, 2CJ, section 337, p. 683, n. 11; section 513, p. 832, n. 30; section 522, p. 840, p. 70; Appeal and Error, 3CJ, section 1589, p. 1415, n. 71; Brokers, 9CJ, section 73, p. 573, n. 6; p. 574, n. 7, 9; section 127, p. 654, n. 40; section 157, p. 675, n. 11; Common Law, 12CJ, section 32, p. 200, n. 79; Evidence, 22CJ, section 855, p. 760, n. 47; Gaming, 27CJ, section 266, p. 1050, n. 3; section 271, p. 1054, n. 41; p. 1058, n. 47; section 354, p. 1100, n. 75; Trial, 38Cyc, p. 1619, n. 38; p. 1648, n. 27.

*W. B. Norris* for respondent.

*John A. Gerlash* and *Randolph & Randolph* for appellant.

FRANK, C.—Action by plaintiff to recover losses, commissions and expense on sale of 10,000 bushels of corn sold on the Chicago Board of Trade, in Chicago, Illinois, by plaintiff for and on behalf of defendant. Plaintiff recovered judgment and defendant appealed.

The petition alleges:

"Plaintiff for cause of action states that he is engaged in the brokerage business in the city of St. Joseph in buying and selling grain for his patrons upon the Chicago Board of Trade in Chicago in the State of Illinois, and that on the 4th day of December, 1919, defendant employed plaintiff as said broker to sell for him ten thousand bushels of corn for the May, 1920, delivery in Chicago, Illinois, as soon as the corn market on said Board of Trade should reach $1.40 per bushel; that at said time when the market value should be so fixed plaintiff should sell for the defendant upon said Board of Trade ten thousand bushels of corn and that it was further agreed in said contract and according to the custom of trade in said business that if the market price of corn should advance in price that the defendant would protect plaintiff against any loss that might accrue to plaintiff by reason of selling said corn.

"Plaintiff further states that in pursuance of said contract of employment he did on the 4th day of March, 1920, in pursuance of the terms of said contract and at the first opportunity that the market value of corn on the Chicago Board of Trade reached the price of $1.40 per bushel, after said contract of employment was entered into between the plaintiff and defendant, plaintiff sold upon said Board of Trade for the benefit of said defendant ten thousand bushels of corn to be delivered in Chicago, Illinois, during the month of May, 1920, and plaintiff obligated himself in pursuance of the terms of said contract and the custom of the trade to deliver said corn in Chicago during the month of May, 1920.

"Plaintiff further states that during said month of May and the time fixed in said contract for the delivery of said corn, the defendant refused, failed and neglected to deliver said corn as provided for in the contract entered into between the plaintiff for and in behalf of the defendant with the purchaser of said corn and that by reason of the failure of the defendant to deliver said corn plaintiff was required by virtue of said contract with the defendant, to deliver during the month of May, 1920, said corn in Chicago, or its equivalent and that by reason thereof plaintiff has been damaged in the sum of $4,777.80."

The answer is a general denial. Plaintiff's evidence relative to his employment by defendant for the purposes alleged in the petition is as follows:

"Q. Now, did you on the 3rd day of December meet Welles Andrews? A. I met Mr. Andrews at the hotel—at the St. Francis Hotel on the evening of December 3.

"Q. Now, tell what conversation you had with him in reference to the purchase and the sale of corn? A. Mr. Andrews was talking to some men when I went in the hotel. I stopped and shook hands with the men. He called me to one side and said he wanted to talk with me privately. We walked in the corner and he commenced asking me about the market, what I knew about the market; what I thought about the market. He told me that he had a lot of corn a surplus of at least ten thousand bushels that he wanted to sell if the market went any higher and asked if he could sell that corn on the Chicago market and deliver the corn on the regular Chicago contract of May corn; that he wanted to sell it for May, because he thought it probably would be worth more and would be more convenient for him to deliver. I told him 'he could,' that he could sell ten thousand Chicago May corn or whatever he wanted and he could ship the corn on the contract if he wanted to or if he didn't want to, he could hold the corn if he could get more money for it at home, and he could sell it at home and buy in and fill his contract in Chicago. He said he had never had any experience and had me go into the details of the most minutest. He asked me what the freight was from Tarkio to Chicago and the charges and then he said, 'now if corn goes down, I want to buy fifty thousand bushels of May corn in Chicago and I will buy five hundred cattle and feed cattle and feed up my corn I have got at home.' Then he asked me if he could buy corn in Chicago and have it delivered if he wanted it delivered. I told him he could in Chicago. He asked me where it would be delivered. I told him it would be delivered either on track or in store, most likely in store. He wanted to know what it would cost to get it from Chicago to Tarkio and I told him what the freight was and if it was loaded out of store in Chicago, it would cost about one cent a bushel loading charges. If it was delivered on track, that would be eliminated, but that would be entirely up to the party that sold it. He said that looked all right and gave me an order to sell ten thousand Chicago May corn at $1.40 per bushel if it got that high. He also gave me an order to buy fifty thousand bushels of Chicago May corn at $1.10 if it went down to $1.10. And if one order was filled, that he did not want the other filled. Whichever one it went to first was to be executed. I explained to him that the orders would be put in the next morning and that they would be put in open orders with a Chicago brokerage firm; that if the market got to either $1.40 or $1.10 that one of the orders would be filled, whichever it got there first. He wanted to know in addition about the fifty thousand bushels

whether he could sell the fifty thousand bushels after he bought it in Chicago provided he could buy it at home for less than it would cost him in Chicago and by him furnishing any difference. I told him he could and explained about that. He evidently had never traded before because he asked all those questions. I wrote the order on a card and the next morning I went to the office which was the 4th of December."

On December 4, plaintiff sent to a brokerage firm in Chicago the following order:

"PRIVATE WIRE

"Thomson & McKinnon                                  12-4-19

"OPEN

"Sell 10 May C 1.40

"Open 140                                            Gordon"

The books, records and files of the brokerage firm of Thomson and McKinnon relative to this sale were identified by witness Hermes as original records of said firm, made in the usual course of business, and offered in evidence. These records show that on March 2, 1920, said brokerage firm sold for plaintiff 10,000 bushels of May corn at $1.40 to James R. Bennett & Co., and that plaintiff was immediately notified of such sale.

Plaintiff received notice of this sale by wire on the day it was made and immediately notified defendant by letter that the sale had been made and drew on him for $1000, the amount required to be advanced on said sale. Defendant refused to pay the draft and it went to protest. Another draft on March 8 met the same fate. Between March 8 and May 27 plaintiff wrote defendant five different letters in which he called his attention to the unpaid draft and reminded him that his contract for the sale of 10,000 bushels of May corn was still open in Chicago and would have to be filled before the last of May. In the letter of May 17, plaintiff called defendant's attention to the fact that the time for delivery of the corn was getting short and that he hoped defendant would be able to get his corn out to fill the contract so it would arrive in Chicago before the last day of May as the contract would have to be filled before that time or corn bought on the last day for the purpose of filling the contract. Finally on May 27, 1920, plaintiff wrote defendant another letter which is as follows:

"Mr. Welles Andrews,

"Tarkio, Mo.

"Dear Sir:—There are only two more days for the settlement of your contract on the sale of 10M May corn that I have written you so often in reference to and unless the Directors of the Chicago Board of Trade make a settling price on the May contracts which will bind all who are interested and are delinquent on shipments, I will be compelled to buy 10M bu. on Saturday, the last business day of this

month, to fill your contract unless you do otherwise between now and that time. Of course if you are shipping the corn, you must let me know between now and Saturday how much you are shipping so arrangements can be made to apply it on your contract and unless I hear from you between now and then, I will comply with the regular customs of the business.''

Defendant never replied to any of these letters. He testified that letters came but he paid no attention to them, threw them in the waste basket.

Plaintiff testified that on May 29, he bought in 10,000 bushels of corn at one dollar eighty-seven and one-half cents to fill his contract in Chicago; that the market price of that corn on that day was $1.87 to $1.88; that he paid the full amount which was $4750; that in addition to this amount, the commission for buying and selling the corn was $25 and the war tax was $2.80. The books and records of plaintiff and of the brokerage firms in Chicago, were identified and introduced in evidence. These records show that on May 29, 10,000 bushels of corn was purchased in Chicago for the account of plaintiff.

Defendant denied authorizing plaintiff to sell corn for him and denied having any conversation whatever with plaintiff on that subject. He testified that he was not at the St. Francis Hotel in St. Joseph on December 3, and did not see plaintiff on that day. His testimony on this subject is corroborated by other witnesses who testified that they were with him on that date, knew of his whereabouts and that he did not talk to plaintiff on that day. Marion Andrews, a brother of appellant, testified that he saw plaintiff at St. Francis Hotel at St. Joseph about December 4, and gave him an order to sell 10,000 bushels of corn for May delivery whenever it reached $1.40, but he never heard anything from plaintiff thereafter.

It is contended by appellant that no case was made because: (1) there is no evidence of a custom of the trade, known to defendant, authorizing a broker to buy corn to fill defendant's contract or to liquidate damages on behalf of defendant; (2) there is no evidence that defendant authorized plaintiff to settle damages for defendant in event of defendant's failure to deliver the corn which plaintiff sold; (3) there is no evidence that May corn was quoted on the market at $1.40 on March 2, 1920, or on any other date; (4) there is no evidence that defendant authorized plaintiff to sign defendant's name to an order for the sale of corn.

The first, second and fourth reasons assigned in support of this contention may be considered together.

The evidence shows that plaintiff contracted to sell the corn in his own name. The wire to the Chicago brokers to sell 10,000 bushels of corn for May delivery was signed by plaintiff and did not mention defendant's name. The record shows that although plaintiff made

the sale in his own name, it was made at the request and on behalf of defendant. The question presented is whether or not, plaintiff's authority to sell corn for defendant carried with it authority to plaintiff to contract said sale in his own name and thereafter perform said contract, upon defendant's failure so to do, then recover from defendant the money necessarily expended by him in the performance of the contract so made.

The law is well settled that where an agent is authorized to make a contract for and on behalf of his principal, he may make such contract in his own name, and thus bind his principal. The only distinction between a contract executed by an agent in his own name, and one executed by an agent in the name of his principal is, the former binds both the principal and the agent, while the latter binds the principal alone.

The liability of the principal depends on whether or not the act done by the agent was within the scope of his authority, and not on the manner in which the agent performed the act. [Donner v. Whitecotton. 212 S. W. 378, 201 Mo. App. 443, and cases cited; Nichols Shepard & Co. v. Kern, 32 Mo. App. 1, 6; Nixon v. Downey, 49 Iowa, 166.] The purpose of the law in holding an agent liable on a contract made in his own name on behalf of an undisclosed principal is for the protection of the other party to the contract and not to shield the undisclosed principal from liability to the agent who is forced to expend money to perform the contract, because of the default of the principal who authorized the making of the contract.

The rule governing the liability of a principal to his agent in the situation and under the circumstances here considered, is well stated in Meecham on Agency, vol. 2 (second edition) section 2480, page 2093, as follows:—

". . . Thus when a broker purchases or sells property without disclosing to the respective principals in the transaction the name of the party for whom he acts, he becomes, on the one side, liable personally for the purchase price of the property bought, and, on the other, is entitled to collect such price from the principal at whose instance the purchase was made. The principal in such a case can relieve himself from liability to the broker only by showing payment of the contract price by him to the original vendor, or a release for a good and valuable consideration from the broker.

"So where a broker acting in good faith, but without disclosing his principal, sold repudiated bonds by the direction of his principal, it was held that he was entitled to recover from the latter the damages he had suffered by reason of making the sale.

"So a broker who at the direction of his principal, buys property for the principal to be held as an investment or carried for an ad-

616

vance, is entitled to be reimbursed for the cost thereof; or for other expenses properly incurred according to the rules of the exchange or market in which the parties are dealing, and, in case he is compelled to resell it at a loss owing to the refusal or neglect of the principal to make further payments or keep good his margins, the broker is entitled to recover for the loss thereby sustained.''

Many cases are cited in support of the text above quoted.

We cannot say that there was no evidence that May corn was quoted on the market at $1.40 on March 2 for the reason that the record shows that plaintiff on that date sold the corn *on the market* at $1.40. The fact that the corn was sold *on the market* on that date at $1.40 is some evidence that the corn was quoted *on the market* at $1.40 at that time.

It is next contended that the transaction between plaintiff and the Chicago brokers were gambling transactions and being such were unlawful and prohibited.

Our statute, section 3572, Revised Statutes 1919, provides ''that on purchases and sales or pretended purchases and sales or contracts and agreements for the purchase and sale of . . . grain . . ., either on margin or otherwise without any intention of receiving and paying for the property so bought, or delivering the property so sold, and all the buying or selling or pretended buying and selling of such property on margin or on optional delivery, when the party selling the same or offering to sell the same, does not intend to have the full amount of the property on hand or under his control to deliver upon such sale or when the party buying any of such property or offering to buy the same does not intend actually to receive the full amount of the same if purchased are hereby declared to be gambling and unlawful and the same are hereby prohibited.''

Under this statute if either party to a contract for the sale of grain does not intend that such grain shall be delivered to and accepted by the party buying same, but intends merely to speculate on the rise and fall of the market, such transaction would be gambling although the other party to the transaction intended that the grain should be delivered to and accepted by the buyer, but this statute has no application to this case for the reason that the transactions were had in the State of Illinois. [Claiborne Commission Co. v. Stirlen, 262 S. W. 387, 388.]

The laws of Illinois are neither pleaded or proven, therefore, we must indulge the presumption that the common law is in force in that State. [Edwards' Brokerage Co. v. Stephenson, 160 Mo. 516, 61 S. W. 617; Elmore Shultz Grain Co. v. Stonebraker, 202 Mo. App. 81; Claiborne Commission Co. v. Stirlen, 262 S. W. 387, supra, and cases cited.]

Under the common law, buying and selling or pretended buying or selling, of grain or other commodities for future delivery, were not gambling transactions or illegal, unless both parties thereto intended they should not be bona-fide transactions but mere speculations in the rise and fall of the market. [McVane v. Wehmeier, 256 S. W. 1085, 1087, and cases cited.]

The record in this case shows that defendant intended that the corn sold should be delivered to the purchaser. He told plaintiff that he had a lot of corn, a surplus of at least 10,000 bushels that he wanted to sell if the market went any higher and asked if he could sell that corn on the Chicago market and deliver the corn on the regular Chicago contract of May corn; that he wanted to sell it for May, because he thought it probably would be worth more and would be more convenient for him to deliver. Plaintiff told him that he could sell the corn for May delivery and deliver it. Defendant then gave plaintiff an order to sell 10,000 bushels of Chicago May corn at $1.40 per bushel if it got that high. There is no evidence that the purchaser did not intend to accept and pay for the corn, and no such defense is pleaded in the answer. The burden is on defendant to prove that the transactions had were gambling. [Claiborne Commission Co. v. Stirlen, 262 S. W. 387, 389, and cases cited.]

While the record in this case shows that no corn was delivered on this contract, this fact alone does not determine the validity of the contract. "The thing which taints a sale for future acquisition and delivery is that there never was any intention to procure and deliver, or receive and pay for, thereby becoming a mere wager on the market price of the article at a given time." [Yontz v. McVean, 202 Mo. App. 377, 379, and cases cited.] The evidence shows that the apellant had 10,000 bushels of corn on hand at the time the sale in question was made, and intended to deliver it. There is no evidence that the purchaser of this corn did not intend to receive and pay for it. The contract in suit is governed by the common law and under that law the contract is valid regardless of the buyer's intention.

It is next contended that the court erred in admitting in evidence the orders sent to Chicago by plaintiff; the sight draft drawn on defendant; the account books of plaintiff; the correspondence between plaintiff and the Chicago brokers; and the letters written to defendant by plaintiff.

Of this contention, appellant says:—

"We, of course, concede that some of these writings would have been competent for the sole purpose of affecting the proof, and measure of damages, if plaintiff had received from defendant any authority to buy corn to fill the alleged contract, but this record fails to show any such authority."

We have already determined that plaintiff had authority to buy corn to fill the contract. It will be noted that appellant concedes that if plaintiff had such authority, some of the documentary evidence to which objection is made was competent on the measure of damages, but he fails to point out in brief what part of such evidence was, and what part was not admissible, on that issue. In this state of the record, appellant is not in a position to insist that the admission of such evidence was error.

Contention is made that the court erred in giving plaintiff's instruction No. 1. The complaints lodged against this instruction are: (a) there is no evidence that on March 2, 1920, corn was quoted at $1.40 per bushel on the Chicago Board of Trade; (b) there is no evidence that plaintiff was obligated to deliver the corn in Chicago at $1.40 per bushel during the month of May, 1920, and no evidence that plaintiff was authorized to so obligate himself; (c) there is no evidence that plaintiff was required to deliver corn in Chicago during May, 1920; (d) there is no evidence that plaintiff was damaged by anything which he was authorized to do under his contract with appellant; (e) there is no evidence of the reasonable market value of corn in Chicago at the time defendant was required to deliver it.

What we have already said disposes of the complaints made in paragraphs a, b, c, and d. Plaintiff testified without objection that on May 29, he bought 10,000 bushels of corn in Chicago for the purpose of filling defendant's contract in Chicago. He further testified that the market price of that corn on that day was $1.87 to $1.88. This testimony disposes of appellant's contention that there was no evidence of the market value of the corn purchased by plaintiff.

No error was committed in refusing defendant's requested instructions "c," "d," "e," "f" and "g."

Instruction "c" is in effect a demurrer to the evidence. It recites that there is no evidence that plaintiff was authorized to incur any indebtedness on the part of defendant, and directs a verdict for defendant.

Instruction "d" directs a verdict for defendant in event the jury found that plaintiff did not actually buy 10,000 bushels of corn and deliver it to the purchaser on March 2, 1920.

If, as heretofore held, defendant's agreement to sell and deliver May corn was lawful, it could not be rendered invalid thereafter because plaintiff paid damages caused by defendant's breach of the contract, instead of delivering the corn.

Instructions "e" and "f" told the jury that the books and records of the Chicago brokers, the books and records of plaintiff and letters written by plaintiff were no evidence whatever of a contract between plaintiff and defendant and must not be considered by the jury as tending to prove such contract.

These instructions are objectionable in form, if for no other reason. It is not proper to instruct the jury that certain evidence is or is not proof of an ultimate fact, unless at the same time the jury be told the purpose for which such evidence was admitted. These instructions, in the form requested, are misleading, argumentative and a comment on the evidence. [Steinwender v. Creath, 44 Mo. App. 356, 361.]

Instruction "g" told the jury that if there was no intention of any actual delivery of grain on the part of both or either of the parties to the transactions in question, then such transactions were gambling and the verdict must be for defendant.

This instruction is bad for two reasons, (1) there is no evidence that either of the parties to the transactions did not intend actual delivery of the grain, and (2) under the common law which governs this case, the intention of nondelivery on the part of only one party to the contract, would not vitiate it.

We find no reversible error in the record, and accordingly affirm the judgment. *Williams, C.,* concurs.

PER CURIAM:—The foregoing opinion by FRANK, C., is hereby adopted as the opinion of the court. *Bland* and *Arnold, JJ.,* concur; *Trimble, P. J.,* absent.