STATE EX REL. CRANE COMPANY, Plaintiff, v. STOKKE, et al, Defendants. COCHRAN SARGENT CO. et al, Appellants. EVANS, Intervenor and Respondent.

(272 N. W. 811)

(Files Nos. 7891 and 7895. Opinion filed April 16, 1937)

Bailey & Voorhees and M. T. Woods, all of Sioux Falls, for Appellant Ætna Casualty & Surety Co.

Cherry & Braithwaite, of Sioux Falls, for Appellant Cochran Sargent Co.

Danforth & Davenport, of Sioux Falls, for Respondent William D. Evans.

PER CURIAM. In the year 1929 one Iver Stokke, a resident of this State, was a sole trader engaged in the heating and plumbing business, operating sometimes under his individual name and sometimes under the name of Stokke Heating & Plumbing Company. During that year Stokke entered into five different contracts, which for convenience we will refer to by the Nos. 1 to 5 in the chronological order of the contracts, the date used in each instance being the date of Stokke's application for surety bond upon the respective contracts. They were as follows:

No. 1, May 17, 1929, a contract with the State of South Dakota for installing the heating, ventilating, plumbing, and sewer in connection with the construction of a boiler house at the State School for the Deaf.

No. 2, June 5, 1929, a contract with the State of South Dakota for installing the heating, ventilating, plumbing, and sewer in connection with the construction of an industrial building at the State School for the Deaf.

No. 3, July 20, 1929, a contract with the State of South Dakota for installing the heating, ventilating, plumbing, and sewer in connection with the construction of a dormitory at the State School for the Deaf.

No. 4, August 10, 1929, a contract with the State of South Dakota for furnishing and installing an oil burner at the State School for the Deaf.

No. 5, September 13, 1929, a contract with Eagle Butte Independent School District for installing the heating, ventilating, plumbing, and sewer in connection with the construction of a school house at Eagle Butte, S. D.

As to each of the foregoing contracts Stokke was required to and did furnish a bond guaranteeing his performance thereof, which bonds were written in each instance by the Ætna Casualty & Surety Company (a corporation, to which we will hereinafter refer as The Ætna). Each bond became effective on or about the date of Stokke's application therefor as above set out. The penal sums of the respective bonds were as follows: On contract No. 1, $13,000; on contract No. 2, $2,765; on contract No. 3, $7,093; on contract No. 4, $4,560; and on contract No. 5, $8,145.

Before the completion of these contracts Stokke became involved in serious financial difficulties. He did not meet his bills for labor and material as they came due and his creditors and his surety The Ætna became much concerned. In February, 1931, Stokke filed a voluntary petition in bankruptcy. In May, 1931, Crane Company, who had furnished certain materials to Stokke in connection with contract No. 3 for which payment had not been made, instituted the present action in the name of the State (Section 8216, R. C. 1919) against Stokke and his surety The Ætna to recover the contract price of said materials. Cochran Sargent Company, who had an unpaid claim for materials furnished to Stokke on contract No. 3 in the amount of $1,281.54 intervened and asserted its claim for that amount against Stokke and his surety. One Fred J. Huhn, who had a similar claim, also intervened and asserted his claim. The Ætna had previously and admittedly become liable to Cochran Sargent Company in the amount of $2,684.54 for material furnished by Cochran Sargent Company to Stokke on contract No. 5 for which Stokke had failed to pay.

The State of South Dakota held four warrants payable to Stokke but not yet delivered to him, as follows: One warrant for $1,560, representing the balance due on the contract price of contract No. 4; two warrants, one for $530 and one for $135.61, representing payment for extra items pursuant to oral agreement in connection with contract No. 3; and one warrant for $26.89 for extra work pursuant to an oral agreement in connection with contract No. 2. One William D. Evans was asserting a right to the proceeds to the $1,560 warrant and had started suit against Stokke, garnishing the State, and Stokke himself had meanwhile been adjudicated a bankrupt and one Gullick had been duly appointed as his trustee. After the intervention of Cochran Sargent Company and Huhn, in an apparent effort to have all the controversies between the several parties in interest adjudicated in one action if possible, The Ætna caused Evans, Gullick, as Stokke's trustee in bankruptcy, and the State of South Dakota to be brought in as parties to the action. The issues between the various parties were duly joined by proper pleadings, material facts were for the most part stipulated, and the matter came on for trial in the court below where findings of fact and conclusions of law were duly made and judgment entered accordingly. By this judgment it was determined: First, that lapse of time had barred the use plaintiff Crane Company and the interveners Cochran Sargent Company and Huhn from successfully asserting any claim against the defendant The Ætna upon its bonds as surety for the performance of Stokke's contracts. From this portion of the judgment no appeal has been taken. Second, it was adjudged that the use plaintiff Crane Company was entitled to the proceeds of the three smaller warrants and to a further judgment against the defendant Stokke. This portion of the judgment likewise stands unappealed. Third, and with reference to the $1,560 warrant representing the balance of the contract price due from the State on contract No. 4, it was adjudged that the sum of $1,274 thereof be paid to intervener Evans, who should recover his costs against both The Ætna and Cochran Sargent Company, and that the balance thereof in the amount of $286 be paid to intervener Cochran Sargent Company. As to this portion of the judgment, defendant The Ætna moved for new trial and upon denial thereof appealed (appeal No. 7895), and so likewise did intervener Cochran Sargent Company (appeal No. 7891).

However numerous may have been the controversies between the parties below, it is clear that each of the two appeals now before us relates solely to the respective rights of defendant-appellant the Ætna, intervener-appellant-respondent Cochran Sargent Company, and intervener-respondent Evans in and to the proceeds of the $1,560 warrant. It will be convenient, therefore, to deal with both appeals by this opinion.

By its appeal (No. 7895) The Ætna maintains that it should have been awarded the entire $1,560 and predicates its claims upon the following facts: When Stokke at the various dates hereinbefore mentioned applied to The Ætna to become his surety and execute bond in his behalf guaranteeing his performance of the five contracts hereinbefore referred to his application for bond in each instance was in writing and provided in part as follows:

"Third: That for the better protection of the said company, and as of the date hereof, the undersigned indemnitor (s) who are named as principal (s) in said bond do hereby assign, transfer and convey to the said Company all rights, title and interest in and to all the tools, plant, equipment and materials of every nature and description that the said principal (s) may now or hereafter have upon said work, or in or about the site thereof, or used in connection with the work and located elsewhere, including as well materials purchased for or chargeable to said contract, which might be in process of construction or storage elsewhere, or in transportation to said site, hereby assigning and conveying also all rights in and to all sub-contracts, which have been, or may hereafter be entered into, and the materials embraced therein, and the said principal (s) authorize and empower said company, its authorized agents or attorneys, to enter upon and take possession of such tools, plant equipment, materials and sub-contracts, and enforce, use and enjoy such possession, upon the following conditions, viz: This assignment shall be in full force and effect as of the date hereof: (1) Should the said principal (s) fail to pay any premium charge when due, or should they fail or be unable to complete, in accordance with its terms, any contract covered by a bond of this Company, or in the event the said principal (s) abandon the work under, or fail to comply with the terms or conditions of, any such contract. (2) If the said principal, being an individual, dies, absconds, is a

fugitive from justice or is convicted of a felony. (3) If the principal (s) fail to pay bills incurred on the work, when they become due and payable, whether the company may be liable for such bills or not. (4) If any proceedings are brought against the principal (s) alleging that they are insolvent, or if any receiver or trustee for the benefit of creditors is appointed, whether such principal (s) are insolvent or not. (5) If any proceedings are brought which deprive the principal (s) of the use of any part of the equipment used in connection with the work under their contract so as to hinder, delay or impede the normal and satisfactory progress of the work.

"Fourth: That the said company, as surety on said bond, as of this date, shall be subrogated to all rights, privileges and properties of the principal (s) in said contract, and said principal (s) do hereby assign, transfer and convey to said company all the deferred payments and retained percentages arising out of this contract, and any and all monies and properties that may be due and payable to said principal (s) at the time of the happening of any of the occurrences mentioned in clauses one, two, three, four and five of the next preceding paragraph, or that may thereafter become due and payable to said principal (s) on account of this contract or on account of extra work or materials supplied in connection therewith, hereby agreeing that all such monies and the proceeds of such payments and properties shall be the sole property of the said comapny, and to be by it credited upon any loss, damage, charge and expense sustained or incurred by it as above set forth under any bond of suretyship it has executed for the undersigned principal (s).

"Fifth: Any security taken by the company, in connection with said bond, including the assignment of monies coming due from the contract, and the assignment of equipment and materials used on or in connection with such contract, may be held by the company, as a protection against any bond heretofore or hereafter executed by the company on behalf of the undersigned principal (s), and the company may sell or realize upon the said collateral at its discretion, at public or private sale, and with or without notice to the indemnitor (s) of the time or place of such sale, for the purpose of protecting itself against any claim, demand or loss under the said bond, or any other bond so outstanding and after indemni-

fying itself fully for any loss incurred on any bond issued at the request of the said principal (s), any balance, after such reimbursements, shall be paid to said principal (s), after all liability of the company has ceased to exist under said bond or bonds."

During the period from June to the middle of September 1929, The Ætna had become surety for Stokke upon all five of the contracts. It is conceded, and the court found, that as early as November 29, 1929, Stokke failed to pay bills incurred on some of these contracts (application, paragraph third, subdivision 3) and the creditors complained thereof to the surety. The Ætna maintains that upon the happening of this contingency the assignment of moneys due or to become due on the contract embraced in the application above quoted become effective as to each of the five contracts as of the bond application date, which so far as concerns contract No. 4 relating to the oil burner whence the fund of $1,560 derives was August 10, 1929. The Ætna maintains, therefore, that from and after November 29, 1929, it had a valid assignment as of August 10, 1929, of all moneys due or to become due on contract No. 4. The Ætna further maintains that by virtue of the provisions of paragraph fifth of the application above quoted it was entitled to hold such assignment as a protection against liability on any bonds previously or subsequently executed by it in behalf of Stokke and to protect itself against claim, demand, or loss under any bond it had outstanding in Stokke's behalf. The Ætna suffered no loss by reason of having bonded Stokke on contract No. 4, nor did it suffer any loss by reason of having bonded Stokke on any of the other contracts performed at the School for the Deaf, being contracts numbered 1, 2, and 3. Admittedly, however, The Ætna did suffer a loss arising from its obligations incurred as surety for Stokke on contract No. 5 (The Eagle Butte schoolhouse), in that it incurred liability to Cochran Sargent Company, which it presently paid, in the amount of $2,684.54 for materials furnished by Cochran Sargent Company on the Eagle Butte job for which Stokke failed to pay. The Ætna consequently claims that by virtue of the assignment embraced in the bond application it became the equitable owner on November 29, 1929, as of August 10, 1929, of this $1,560 and that it is entitled to retain the same and apply it to the recoupment of its loss of $2,684.54 suffered on contract number 5.

Cochran Sargent Company by its appeal (No. 7891) maintains in turn that it is entitled not only to the portion of the $1,560 fund awarded it by the court ($286) but to the whole thereof and bases its claim upon the following facts: By April, 1930, Stokke was indebted to Cochran Sargent Company for materials furnished upon the four contracts at the School for the Deaf in an amount of $1,281.54, all past due and unpaid. For the payment of this amount The Ætna would have been liable to Cochran Sargent Company by virtue of its bonds guaranteeing the four contracts if proper claim had been made therefor in due time. Stokke was also indebted to Cochran Sargent Company in a sum in excess of $10,000 for materials furnished to him in connection with other contracts not involved in this case, all of which was past due and unpaid. On April 14, 1930, Stokke, for the purpose of protecting Cochran Sargent Company as to these amounts, transferred and assigned to said Cochran Sargent Company as collateral all amounts due and owing to him or to become due and owing to him from the School for the Deaf on contracts for labor and material furnished and performed or to be furnished and performed at said School for the Deaf. On the day of its date this assignment was presented to and accepted by the superintendent of the School for the Deaf by written indorsement thereon as follows:

"I hereby accept the above assignment and agree to pay all warrants covering the above sum direct to Cochran Sargent Company on or before the 14th day of April, 1930.

"E. S. Tillinghast,
"Supt. S. D. School for Deaf."

At the time of taking this assignment Cochran Sargent Company had no knowledge of any claim of prior assignment by the Ætna nor did it have knowledge of any claim of any kind by the intervener Evans. Cochran Sargent Company does not claim that it furnished any further materials to Stokke after the taking of this assignment, but it does contend that, by virtue of having this assignment and in reliance thereon, it refrained from filing claims against The Ætna for $1,281.54 for materials furnished on contracts bonded by The Ætna, which claims it could have filed and but for said assignment would have filed. Upon these facts Cochran Sargent Company insists that it is entitled to the entire sum of

$1,560 and that even upon views of the law most unfavorable to its contentions it should at least be entitled to $2,281.54 thereof.

In both appeals the interest of intervener William D. Evans is entirely that of a respondent. He maintained that he was entitled to $1,274 of the $1,560 fund, and the trial court awarded him all that he asked. He rests his position upon the following facts: In June or July, 1929, it was agreed between intervener Evans and defendant Stokke that they would enter a bid for furnishing and installing the oil burner at the School for the Deaf, being the work covered by contract No. 4 subsequently entered into by Stokke. It was agreed that the bid should be in the name of Stokke and, if they were successful bidders, that the contract should be taken in the name of Stokke and that Evans should personally supervise the ordering and installation of the equipment and that after paying the cost of the equipment and the cost of installing the same the balance of the contract price should be equally divided between them. Their bid in the name of Stokke being successful, contract was awarded in the name of Stokke for the agreed price of $4,560. Pursuant to the oral agreement, Evans ordered and supervised the installation of the burner. The total cost of the material and installation thereof was $2,012, leaving a profit on the contract of $2,548. Evans never having received anything out of the contract, maintains that he is entitled to receive out of the $1,560 fund arising from the performance of this contract his half of the profit over and above the cost of material and labor, to wit, $1,274. He maintains that he was always the equitable owner of this fund to this extent and that Stokke had not right to assign or dispose of his interest therein and that his rights thereto are superior to any claims either of The Ætna or to Cochran Sargent Company.

For the moment we will put entirely to one side the claim of Evans and the facts relating thereto and will consider the matter as though Stokke individually (in whose name the oil burner contract was taken) was in fact the sole party who had any right or interest therein, and we will assume as unquestioned, for the present, that Stokke had full and complete right to deal with said contract and all the proceeds thereof as he saw fit. Dealing with the matter from this aspect, we will consider the respective claims and priorities of The Ætna and Cochran Sargent Company. The

learned trial judge, by awarding to Cochran Sargent Company the balance of the fund over and above what he allowed to intervener Evans, determined of course that the rights of Cochran Sargent Company (at least up to the extent of $1,281.54) were superior to the rights of The Ætna.

There is no question but that Stokke made an assignment to The Ætna and likewise to Cochran Sargent Company. What Stokke had to assign and did assign was a contract right to receive money—a chose in action. The loss which The Ætna seeks to recoup was not suffered on this particular contract No. 4, and the materials for which Cochran Sargent Company was unpaid were not furnished on this particular contract. The Ætna and Cochran Sargent Company occupy the position of successive assignees of a chose in action. Cochran Sargent Company admits that the assignment of The Ætna was prior in point of time. The record also shows that when Cochran Sargent Company took its assignment it had not notice of the prior assignment, and the record further shows that Cochran Sargent Company, although the subsequent assignee, was the first to give notice to the debtor. In making this last above statement, we assume, without deciding, as counsel in the case have assumed, that, under the circumstances of this case, notice to the superintendent of the School for the Deaf was in fact and law notice to the debtor. The Ætna maintains that the first assignee should prevail; Cochran Sargent Company maintains that the assignee who first gave notice to the debtor should prevail. These contentions present squarely a most interesting and much controverted question. The Ætna contends for what is frequently known as the American rule, which has been the law in a numerical minority of our state jurisdictions and which became the law of the federal courts by the decision in the leading case of Salem Trust Co. v. Manufacturers' Finance Co. (1924) 264 U. S. 182, 44 S. Ct. 266, 68 L. Ed. 628, 31 A. L. R. 867. Cochran Sargent Company advocates what is generally denominated the English rule arising out of the case of Dearle v. Hall (1828) 3 Russ. 1, 38 Eng. Rep., Full Reprint, 475. The situation is well stated by a commentator in 33 Yale Law Journal, 767, as follows:

"In the leading case of Dearle v. Hall the English courts early established the rule later broadened to cover all assignments of

choses in action that a subsequent assignee of a cestui's interest who inquired of the trustee and gave him notice of his assignment was entitled to priority over a former assignee who failed to give such notice. This doctrine was based on the analogy to the sale of chattels to a later vendee by a vendor who has been allowed to remain in possession, and also on the theory that it was the only way to protect against the fraud of the assignor. A few years later the requirement of inquiry was eliminated, and prior notice to the debtor alone was held sufficient. This is the present so-called English doctrine. The rule does not apply to assignments of equitable interests in land, or to cases where recordation of assignments is provided for. Nor can the second assignee recover unless he is a purchaser for value and without notice of the prior assignment. Other courts, however, refused to adopt this doctrine, and applied the general rule that between equal equities, the one prior in time prevails regardless of notice. The basis of this latter rule is often said to be that the assignor has conveyed all his 'title' to the first assignee and has nothing left to convey to the second, and that notice is not necessary to consummate the right of the first assignee. Even under this theory if the second assignee obtains payment from the debtor, or effects a novation with the debtor, or reduces his claim to a judgment, he prevails over the first assignee. And the first assignee may by his conduct be estopped from claiming priority. In the United States the authorities are almost evenly divided between the two views. The United States Supreme Court has recently in the case of Salem Trust Co. v. Manufacturers' Finance Co. (1924) [264 U. S. 182] 44 S. Ct. 266 [68 L. Ed. 628, 31 A. L. R. 867], definitely adopted the rule preferring the first assignee."

For other legal periodical discussion on the point see 39 Harv. Law Rev. 649; 11 Va. Law Rev. 62; 24 Columbia Law Rev. 501; 19 Minn. Law Rev. 236; 6 St. John's Law Rev. 375. Cases presenting both views are collected in a comprehensive annotation in 31 A. L. R. at page 876. The matter is also discussed in Williston on Contracts (Rev. Ed. 1936) § 435, and many cases cited. Even the courts adhering to the American view of protecting the first assignee require him to yield to a subsequent assignee first giving notice in some instances and under some circumstances. See 4 Am.

Jur. p. 312, and cases cited. As stated by the United States Supreme Court in the Salem Trust Co. Case, supra: "If equities are equal, the first in time is best in right. Otherwise the stronger equity will prevail."

We think therefore that because of the stronger equity of the Cochran Sargent Company, so far as concerns the sum of $1,-281.54 for which they might have enforced a claim against The Ætna, that under either view Cochran Sargent Company must prevail over The Ætna to this extent. In this case we are dealing with a surety. As stated in the case of Jenkins v. National Surety Co., 277 U. S. 258, 48 S. Ct. 445, 72 L. Ed. 874: "Whenever equitable principles are called in play, as they pre-eminently are in determining the rights and liabilities of sureties and in the distribution of insolvents' estates, they likewise forbid the surety to secure by independent contract with the debtor indemnity at the expense of the creditor whose claim he has undertaken to secure."

So in this case we believe that Cochran Sargent has a stronger equity than The Ætna to the extent of $1,281.54. Cochran Sargent took its assignment to protect the surety as much as itself, and now the surety is claiming an assignment of the same fund at the expense of the creditor whose claim it has undertaken to secure. Clearly, it seems to us, equities are not equal in this case. As between the two, Cochran Sargent Company has a stronger equity than the Ætna in the $1,281.54 and to that extent must prevail. As to the balance of the fund we believe the Ætna should prevail. We are convinced that the American doctrine has the support of the better reason and we are content to adopt it as the law of this State, and give it application whenever the equities are equal.

We come now to consider the relative rights of appellants and respondent Evans.

Respondent Evans suggests that The Ætna has no valid assignment from Stokke or, if it has such assignment, that the same is not sufficient to cover the balance of $1,560 due on the oil burner contract. We think otherwise, as we have pointed out at some length in discussing the relative rights of The Ætna and Cochran Sargent Company.

Evans urges also that he has a prior right to the fund in question by virtue of his garnishment proceedings instituted

January 10, 1931, and says that but for such garnishment the entire fund would have been paid to Stokke . The garnishment of course was subsequent in time to the assignment to The Ætna, whether such assignment be deemed effective from the date of the bond application (August 10, 1929) or from the date when Stokke failed to pay when due bills incurred upon contracts bonded by The Ætna (November 29, 1929). So far as concerns the contention that the fund would have been paid to Stokke but for the garnishment of Evans in 1931, the stipulation of facts entered into by all parties in the court below says, with reference to the withholding of this as well as other warrants from Stokke, as follows: "Payment of these funds has been withheld on account of complaints by the Keasby-Mattison Company made beginning about November 29th, 1929, that they were not paid by Mr. Stokke, and subsequent information as to Stokke's poor financial condition and the request of The Ætna Casualty & Surety Company as a creditor bonding company made June 23rd, 1930, and the subsequent bankruptcy of Stokke."

In the face of this stipulation Evans is manifestly in no position to urge that the money would have gone to Stokke but for his garnishment in 1931.

Respondent Evans appears chiefly to rely, however, upon the proposition that by virtue of his agreement with Stokke the oil burner contract became a joint adventure. upon the part of the two of them and that he (Evans) is entitled to one-half of the profit thereof in the conceded amount of $1,274 and that the assigned chose in action was his to the extent of such $1,-274 and that to that extent Stokke was powerless to assign or convey the same, citing 33 C. J. p. 874, and Curnen v. Ryan (1919) 187 App. Div. 6, 175 N. Y. S. 50. The concept of joint adventure as a legal relationship or association sui generis is purely of American origin dating from about 1890. Just how or why it originated no one seems precisely to know. Despite much loose language in the decisions, no valid tests seem ever to have been established or to have met with any general acceptance whereby the relationship of joint adventure was distinguishable in its legal results from partnership save perhaps that it has been often said (though seldom tried) that joint adven-

turers might sue one another at law while partners must sue in equity. In commenting upon the matter in a recent article (15 Minn. Law Rev. 644, at page 660) Professor Frank L. Mechem says:

"Historically there appears to be no explanation of the joint adventure concept. Partnership seems to have been recognized as a legal relationship long before the modern theory of a joint adventure made its appearance in the law, although joint adventure situations are usually much less complex and so much more likely to exist in the earlier stages of economic group development. However, if they did the courts saw nothing distinctive in them but lumped them together with partnership, and this practice continues to be the accepted rule in England. Therefore, the concept must be regarded as distinctly modern and local, appearing, as it does, only in the decisions of the American courts.

"It is practically impossible to estimate accurately when and how the theory of joint adventure had its origin. Progress in that direction is impeded by two things—(1) failure of the earliest cases in which the name is employed to explain how it was used, (2) failure of the later decisions to explain from what source the concept was derived. The first cases in which the name was used were Hourquebie v. Girard [Fed. Cas. No. 6,732] and Lyles v. Styles [Fed. Cas. No. 8,625]. From the appearance of these cases down to the Civil War period there are a very few scattering uses of it, but in all of these cases it seems probable that the courts were making use of it, not to describe the relationship of the parties, but to describe the object or purpose of the relationship. In many of them, the reference is to 'adventure,' 'ventures' or 'enterprise' instead of to 'joint adventure.' How much of this language was the result of conscious choice and how much the result of precedent or convenience in expression will never be known. At any rate, it was not until the decision in Ross v. Willett [76 Hun. 211, 27 N. Y. S. 785] that the courts began to refer unequivocally to joint adventure as a legal relationship. But the development since that case has been phenomenal. This may be attributed in part to the fact that the courts had many ready-made rules for it, and in part to the large number of undertakings of the kind to which the concept was thought to apply. Governed entirely by established

laws of partnership, there was nothing new in joint adventure to retard its growth, and many of the difficulties ordinarily encountered in the selection of principles had already been disposed of in the partnership cases.

"There is a suggestion of economic significance in the fact that joint adventure grew up during a period of extreme transition and uncertainty in the law of business association. However, the obstacles to further correlation are so great, due to the generality with which this newcomer in the field of associations was developed that its recorded history can hardly be regarded as a useful source from which to glean an explanation of its origin.

"On the whole the concept of joint adventure as a relationship or association different from partnership, seems to have little, if any, reality. To a lawyer or to a litigant it can make no difference in the present state of the law, whether the courts calls the association by one name or the other. For all practical purposes no one cares very much whether the law treats joint adventures as a special type of partnership or a different kind of association. The consequences of being held to be one or the other are almost, if not quite, identical.

"A recent California case [Wallace v. Pacific Electric R. Co., 105 Cal. App. 664, 288 P. 834] lays down a common test for partnership and joint adventure. The court was asked to construe a contract as creating either a partnership or a joint adventure between the contracting parties. They refused this request, saying:

" 'Our conclusion is that the contract relationship of the defendants, each to the other, is neither that of partners nor of joint adventurers. The intention of the parties to the contract as expressed therein, is clearly against the contention of partnership or joint adventure, in that said contract provides for a letting to the express company of the right to control, conduct and transact transportation business over the lines of the railway company, and the railway company agrees to furnish the necessary cars and car space to the express company for the per centum of net proceeds as compensation. A sharing of profits is not the only test; there must be a community of interest in the business to constitute either a partnership or a joint adventure. Under contract the business is the business of the express company and not the business of the railway company.'

"When the law has progressed to this point—viz., applying the same test and reaching the same legal consequences for both partnership and joint adventure—the usefulness of regarding joint adventure as a distinct kind of relation or association seems questionable."

And after further discussion Professor Mechem states his conclusions as follows (p. 655) :

"A resume of what has been decided in the joint adventure cases clearly reveals that the appellation 'joint adventure' is very loosely employed by many courts. It has been made to include not only associations of two or more persons for the purpose of carrying out a specific business transaction for profit, but also some associations formed for the purpose of, and engaged in the prosecution of a general business over an extended period of time, as well as situations like that in Cecil v. Montgomery [95 Okl. 184, 218 P. 311] involving no more than tenancy in common, or as in other cases, no more than a debtor-creditor relationship.

"Except for the latter class of cases, the use of a distinctive name such as 'joint adventure' is of no legal significance whatever. This is simply because, at the present time, there is no law of joint adventure. There is a law of partnership and that is all. The law of partnership is applied, point for point to all joint adventure controversies, and identical results are reached, under similar circumstances, no matter whether the association is regarded as a partnership or a joint adventure. In the tenancy in common, debtor-creditor situations, rules of law are applied and results reached somewhat different from those that would have followed had the association been regarded as a partnership, but the significance of calling the situation one of joint adventure instead of by the more cumbersome name of tenancy in common plus a fiduciary relationship ad hoc seems to lie wholly in convenience of designation. Such situations as these are quite different from partnership situations, but no one has ever supposed that there is any similarity between them.

"It logically follows from this that there is no reason for distinguishing partnership and joint adventure situations by making a separate classification for the latter, unless perhaps for purposes of convenience in describing a kind of partnership, and even so it

is arguable that the English practice of calling it a special partnership is more in harmony with a desire for simplicity and uniformity in the classification of law and legal relationships.

"But even if it was desirable to maintain the asserted distinction between partnership and joint adventure, it seems obvious upon a moment's reflection that such a distinction should not be predicated entirely upon a difference in the purposes of the associations. In view of the magnitude and complexity of many joint adventures, is it not contradicting the facts to say that partnerships are business organizations and they are not? It is submitted that if any dividing line should be drawn between partnership and joint adventure, for whatever purposes, the distinction should be predicated upon differences in what the associations do and not upon the pre-organization declaration of ultimate purpose.

"Paucity of adverse comment upon the concept of joint adventure as an independent legal relationship supposedly governed by laws to some extent different from those applicable to partnerships is no doubt attributable in part to the fact that no litigant has been seriously prejudiced by such a concept. Whether or not a retention of this concept in future controversies will have such an effect is not a matter about which the writer cares to make a guess. What has been said here is merely an attempt to make an appraisal of the present situation and show the fallacy of the current conception of joint adventure."

For other comment see 33 Harv. Law Rev. 852; 21 Va. Law Rev. 821; 33 Mich. Law Rev. 436.

We are under no necessity in the instant case of determining whether or not the law of this State does or should recognize joint adventure as a legal relation different and distinct from partnership. So far as concerns the rights of respondent Evans in this case it is entirely immaterial whether he be deemed a partner of Stokke or a joint adventurer with Stokke if the two terms are not in legal substance synonymous. Concededly, it is the general rule applicable alike to joint adventure and to partnership that one adventurer (or partner) cannot dispose of a coadventurer's (or copartner's) interest in the joint property. It is the rule established by the great majority of decided cases that there is the same element of mutual agency in joint adventures as in partnerships and

that a member of a joint adventure can bind his associates, whether disclosed or undisclosed (as can a partner), by such contracts as are reasonably necessary to carry on the venture. In the instant case, the rights of Evans, whether he was a partner or a joint adventurer, were at all times undisclosed to all other parties until long after the assignment to The Ætna. This is not a case where The Ætna as a creditor of Stokke demanded some security and received in response to such demand the assignment of the chose in action here involved. The right of The Ætna to its assignment dates from the bond application. By the terms of the joint adventure or partnership agreement Stokke was to bid for, and if possible secure, the oil burner contract and enter into such contract in his own name. Evans knew, or is chargeable as a matter of law with knowing, that Stokke could not enter into this oil burner contract with the State of South Dakota without putting up a surety bond to guarantee his performance thereof. Evans must be bound by any reasonable agreement that Stokke made for the purpose of securing a bond which was a prerequisite to enjoying the joint adventure contract. Evans cannot claim the benefit of that bond and repudiate the covenants entered into by Stokke for the purpose of obtaining it. Part of the price which Stokke paid for the bond was his agreement for the assignment if he should default in the performance of this or any other contract entered into by him bonded by The Ætna. This was a valid, reasonable, and enforceable covenant, entered into for the purpose of securing the bond which was essential to permit the performance of the joint adventure, and Evans should not be permitted to repudiate it by coming in and setting up an interest at all times previously undisclosed. As joint adventurer or partner he must bear the burdens of the contract which Stokke made and which was reasonable and necessary for the furtherance of the joint enterprise.

Respondent Evans suggests that he should prevail because the fund in question was created by his efforts. Admittedly, Evans supervised and superintended the installation of the oil burner. It is to be noted that Evans made no attempt in the court below to establish the reasonable value of such service as he actually rendered, and did not seek recovery on the theory that he had contributed a certain value to the enterprise by way of supervision.

What he seeks to recover is not the reasonable value of his contribution, but a one-half share of the claimed profit of the undertaking. In any event, he stands in this regard in no better position than does The Ætna. It is true that Evans furnished the necessary supervision for the performance of this contract and, if such supervision had not been furnished by some one, presumably the contract would not have been performed and the fund would not exist. On the other hand, The Ætna furnished the surety bond by virtue of which the contract was obtained, and it is equally true that, if this bond had not been furnished by some satisfactory surety, the contract would not have been obtained and the fund would not exist. Upon all the facts and circumstances presented by this record, we are of the opinion that respondent Evans, whether a joint adventurer or a copartner, must be bound by the assignment given by Stokke.

The orders denying motion for new trial and the portion of the judgment appealed from are therefore reversed, and the cause is remanded, with directions to the trial court to make proper conclusions and judgment upon the stipulated facts awarding $1,281.54 to Cochran Sargent Company and the balance of the $1,560 to The Ætna.

In appeal No. 7895 The Ætna may tax its costs in this court against Evans. In appeal No. 7891 the Cochran Sargent Company may tax its costs in this court against Evans.

RUDOLPH, P. J., and POLLEY and ROBERTS, JJ., concur.

WARREN and SMITH, JJ., not sitting.