**ETHAN DAIRY PRODUCTS,**
Plaintiff/Appellee,

v.

**Paul AUSTIN and American Cheesemen,
Inc., Defendants and Third Party
Plaintiffs/Appellants,**

v.

**OSHKOSH COLD STORAGE, Third
Party Defendant/Appellee.**

No. 16377.

Supreme Court of South Dakota.

Submitted on Briefs May 24, 1989.

Decided Nov. 22, 1989.

Ronald J. Wheeler of Wheeler Law Office, Huron, for plaintiff/appellee Ethan Dairy Products.

Robert W. Swank of Stiles, Anderson and Swank, Mitchell, for defendants and third party plaintiffs/appellants Paul Austin and American Cheesemen, Inc.

KONENKAMP, Circuit Judge.

Paul F. Austin (Austin) and American Cheesemen, Inc. (American Cheesemen) appeal from a judgment against them for breach of contract on the purchase price of 199 blocks of cheese. We affirm, in part, reverse, in part, and remand.

The president of Ethan Dairy Products (Ethan Dairy) telephoned Austin, the sole owner and president of American Cheesemen and offered to sell two hundred, 40 pound blocks of Grade A cheddar cheese. They negotiated a price of $1.315 per pound and agreed the cheese would be shipped to Oshkosh Cold Storage Company (Oshkosh Cold Storage) in Wisconsin. When the product was shipped, Ethan Dairy's invoice showed Oshkosh Cold Storage as the purchaser. Oshkosh Cold Storage rejected the cheese because its tests showed that the product did not "measure up to State brand grade." Oshkosh shipped one block back and sent a letter asking Ethan Dairy what disposition it wanted made of the remaining 199 blocks.

Austin called Ethan Dairy's president saying he would sell the cheese to someone else, but Ethan Dairy would have to take a six cent discount per pound. Ethan Dairy agreed. Using American Cheesemen's sales and shipping order form, Austin sold the cheese to Old World Creamery. Austin's letterhead and order forms made no mention of brokering, but instead referred to a "Wisconsin Facility" as the shipping point for his company, American Cheesemen.

A few days later Austin sent a letter to Ethan Dairy's president stating:

Dear John:

I am sorry to report to you that last week I looked at some plugs of the 200 blocks you sent to Oshkosh Cold Storage. We in turn sent them to Old World Creamery to be cut into 10# Cheddar Prints. We sold them to him with the understanding that they had round ends. Of course we sold them at a reduced price.

Well, when they were stripped and ready to be cut, they examined the product and adjudged them to be under grade with moisture at 42 percent ... Therefore John, we can only pay you at somewhere around the barrel market ...

John, I feel bad about the transaction for you, but rest assured I worked my tail off trying to get the best return for you. Respectfully,
PAUL F. AUSTIN

Austin followed this letter with another telephone call in which he told Ethan Dairy's president that he would have to accept an eight to ten cent cut in price per pound. Ethan Dairy refused to further reduce the price.

Old World Creamery made periodic payments for the cheese to Oshkosh Cold Storage. After deducting its expenses, Oshkosh Cold Storage endorsed the checks over to "P. Austin and Ethan Dairy." Austin, in turn, passed the checks on to Ethan Dairy. Old World Creamery made four payments totaling $3,864.29 before declaring bankruptcy. Austin claimed that he and his company were acting in the capacity of a broker and declined responsibility for the unpaid balance.

I. DID THE TRIAL COURT ERR IN RULING THAT AUSTIN ENGAGED IN A JOINT VENTURE WITH OSHKOSH COLD STORAGE FOR THE PURCHASE AND RESALE OF ETHAN DAIRY'S CHEESE?

The trial court found Austin and Oshkosh Cold Storage jointly and severally liable for the unpaid balance because they were joint venturers on the purchase and resale of Ethan Dairy's cheese. Austin insists he was only acting as a broker between Oshkosh Cold Storage and Ethan Dairy and neither he nor his company should be held liable for the cost of the cheese.

We apply the "clearly erroneous" standard to a trial court's findings. We will not disturb a factual conclusion unless it appears unsupportable from all the evidence. Conclusions of law, on the other hand, are freely reviewable. *Wefel v. Harold J. Westin & Associates, Inc.*, 329 N.W.2d 624 (S.D.1983).

Courts should be cautious in characterizing the nature of a business relationship without first carefully examining the usage and practice peculiar to the commercial enterprise in question. The purchase and sale of bulk cheese has its own distinctive characteristics in the business world and unquestionably Austin had acted as a broker in this field for many years. Nonetheless, he conceded at trial that he occasionally bought and sold cheese on his own. The question here is what capacity was he acting in with Ethan Dairy.

The law usually distinguishes between a broker and a joint venturer. *Tufts v. Mann*, 116 Cal.App. 170, 2 P.2d 500 (1931).

"Joint venture," a term used interchangeably and synonymous with "joint adventure," or coventure, has been defined as a special combination of two or more persons, where in some specific venture a profit is jointly sought without the necessity of any actual partnership, corporate designation, or other business entity, or as an association of persons or legal entities to carry out a single business enterprise for profit, for which purpose they combine their property, money, effects, skill, and knowledge.

48A C.J.S. *Joint Ventures* § 2 (1981).

Certain requisite elements of the relation have been recognized by the courts, including intent to enter into a joint venture, community of interest in the performance of a common purpose, a joint proprietary interest in the subject matter, a mutual right to control, a right to share in the profits, and a duty to share in any losses which may be sustained ... and usually all of these elements must be present for a joint venture to exist; but no one of the elements essential to the creation of a joint venture is alone sufficient to establish such.

48A C.J.S. *Joint Ventures* § 10 (1981).

■■■ If a broker discloses his principal, the principal only is liable on a contract negotiated by the broker. *Voeller v. Geisler*, 77 S.D. 96, 86 N.W.2d 395 (1957); Restatement (Second) of Agency § 328 (1958). On the other hand, where a broker enters into a contract without disclosing his principal, he is a party to the contract. *Gordon v. Andrews*, 222 Mo.App. 609, 2 S.W.2d 809 (1928); Restatement (Second) of Agency § 322 (1958). Of course, if a broker enters into a contract for himself, his liability is the same as if he were not a broker. *Cryder Well Company v. Stangl*, 257 Iowa 1255, 136 N.W.2d 519 (1965). Here the trial court found that Austin negotiated the cheese purchase for himself and his company as joint venturers with Oshkosh Cold Storage.

Austin argues that the concept of joint venture is commonly used in tort law, but the trial court misapplied its elements to this breach of contract case. Joint venture principles apply to contract actions; we have so held a number of times. *State v. Frank D. Malone Construction Co.*, 81 S.D. 1, 129 N.W.2d 900 (1964); *Fischer v. Bunch*, 70 S.D. 240, 16 N.W.2d 541 (1944); *State v. Stokke et al*, 65 S.D. 207, 272 N.W. 811 (1937); *Hardman v. Lasell*, 55 S.D. 176, 225 N.W. 301 (1929); *Gamble v. Loffler*, 28 S.D. 239, 133 N.W. 288 (1911).

■■■ A joint venture agreement need not be express, but may be implied from the acts and conduct of the parties. *Fredrickson v. Kluever*, 82 S.D. 579, 152 N.W.2d 346, 348 (1967). The elements of a joint venture are: (1) an agreement, express or implied, among members of a group; (2) a common purpose to be carried out by the group; (3) a community of pecuniary interest in that purpose among the members; and (4) an equal right to a voice in the direction and control of the enterprise. *Fredrickson v. Kluever, supra; Hilde v. Flood*, 81 S.D. 25, 130 N.W.2d 100 (1964).

■■■ Applying each element to the testimony reveals ample evidentiary support for the trial court's conclusion that a joint venture existed:

### 1. *Agreement among members of the group.*

Austin testified:

We are talking about the owner of Oshkosh Cold Storage, Walt Doemel. So at times he would ask me to find certain

products for clients that he had and sometimes I would get his permission to make contacts and purchase cheese on his behalf, to later sell into the market place.

### 2. *A common purpose.*

Undoubtedly Austin and Oshkosh Cold Storage had the common purpose of purchasing and reselling cheese.

### 3. *A community of pecuniary interest.*

Concerning his financial arrangement with Oshkosh Cold Storage, Austin testified:

> Well, I believe I had something like two cents a pound over and above the costs and the freight and we just split whatever we made over and above the cost F.O.B. Oshkosh and what we sold it to the buyer for less any expenses like interest and that type of thing. We split the interest, also.

### 4. *An equal right to control the enterprise.*

Through the initial negotiations and later price adjustments with Ethan Dairy, Austin never consulted with Oshkosh Cold Storage before settling on an agreed price for the cheese. At trial Austin testified that he told the Ethan Dairy's president that he was merely representing Oshkosh Cold Storage, but on cross-examination:

> Q: So, during all these conversations when John ordered the cheese from you [sic] and was shipped to Oshkosh and when he wanted to negotiate with you on it, he called you and you said you would take care of it. When he talked to you about payment you said we will see that you're paid, isn't that true?
>
> A: [Austin] We, meaning Oshkosh.
>
> Q: You didn't tell him that? All you said was we?
>
> A: Yeah.

From these facts we are unable to conclude that the trial court erred in determining a joint venture existed between Austin and Oshkosh Cold Storage. *Hardman, supra; B.L. Schrader, Inc. v. Anderson Lumber Company,* 257 F.Supp. 794 (D.Md. 1966).

## II. DID THE TRIAL COURT ERR IN RULING THAT THERE WAS NO FAILURE OF CONSIDERATION?

■ Austin next argues that Ethan Dairy's inferior grade cheese invalidated his purchase agreement for lack of consideration. The Uniform Commercial Code as adopted in South Dakota disposes of this argument.

Austin and Oshkosh Cold Storage contracted with Ethan Dairy for Grade A cheese. Determining that the cheese was less than Grade A quality, Oshkosh Storage rejected it. SDCL 57A–2–601, 57A–2–602(1). The rejection vested title back to Ethan Dairy. Before the cheese was returned to Ethan Dairy, however, Austin renegotiated the price and arranged for Old World Creamery to take all but the one block that was returned. Austin later attempted to negotiate the price further downward, but Ethan Dairy refused. SDCL 57A–2–607 provides:

(1) The buyer must pay at the contract rate for any goods accepted.

(2) Acceptance of goods by the buyer precludes rejection of the goods accepted and if made with knowledge of a nonconformity cannot be revoked because of it unless the acceptance was on the reasonable assumption that the nonconformity would be seasonably cured but acceptance does not of itself impair any other remedy provided by the chapter for nonconformity.

(3) Where a tender has been accepted (a) The buyer must within a reasonable time after he discovers or should have discovered any breach notify the seller of breach or be barred from any remedy....

By renegotiating the price as a condition for accepting the substandard cheese, Austin was precluded from later rejecting it. Austin chose as a remedy for the nonconforming product a reduction of price and Ethan Dairy acceded. But without Ethan Dairy's acquiescence Austin could not exer-

cise the same remedy again and demand a further price cut when Old World Creamery discovered the nonconformity. There was no failure of consideration on the renegotiated cheese purchase.

### III. DID THE TRIAL COURT ERR IN RULING THAT AUSTIN WAS PERSONALLY LIABLE TO ETHAN DAIRY?

 Austin insists he should not be held personally liable because regardless of whether he acted as a broker or joint venturer he was always doing business as president of American Cheesemen. The trial court adjudged Austin and his company liable for the unpaid cheese. Yet Ethan Dairy neither pled nor proved a case for piercing the corporate veil. A corporation must be viewed as a separate legal entity until there is sufficient reason to the contrary. *Mobridge Community Industries v. Toure,* 273 N.W.2d 128 (S.D.1978).

[A] court may pierce the corporate veil when retention of the corporate fiction would produce injustices and inequitable consequences. *Mobridge Community Industries v. Toure, Ltd.,* 273 N.W.2d 128 (S.D.1978). Factors allowing a court to pierce the corporate veil are: 1) fraudulent representations by corporation directors; 2) undercapitalization; 3) failure to observe corporate formalities; 4) absence of corporate records; 5) payment by the corporation of individual obligations; or 6) use of the corporation to promote fraud, injustice, or illegality. *Curtis v. Vlotho,* 313 N.W.2d 469 (S.D. 1961); *Mobridge Community Industries, supra.*

*Farmers Feed & Seed v. Magnum Enterprises,* 344 N.W.2d 699, 701 (S.D.1984). Even when a corporation is adopted for the express purpose of avoiding personal liability it should not be lightly disregarded. *National Bank of South Dakota v. Clason,* 266 N.W.2d 573 (S.D.1978). Yet to avail oneself of the corporate shield, one must act within the corporation bounds.

The record is unclear whether Austin was acting on his own or if he acted as an agent of his company. At times it appears he slipped in and out of the corporate shell. The trial court apparently determined that Austin gave the impression to Ethan Dairy that it was dealing with him personally. Austin testified: "I told him I was representing Oshkosh Cold Storage." When Oshkosh Cold Storage rejected Ethan Dairy's cheese, Austin arranged for his company, American Cheesemen, to sell it to Old World Creamery. But when Old World Creamery paid Oshkosh Cold Storage, Austin directed Oshkosh Cold Storage to endorse the checks over to Austin and Ethan Dairy. Where owners of a corporation by their own acts show that they themselves ignored the corporate entity, the courts may do likewise. Annot., *Disregarding Corporate Entity,* 46 A.L.R.3d 428 (1972). *See Shearson Hayden Stone, Inc. v. Lumber Merchants, Inc.,* 500 F.Supp. 491 (SD Fla.1980). Yet only upon the strongest evidence of the factors set forth in *Vlotho, supra,* and *Mobridge Community Industries, supra,* should a court pierce the corporate veil. The trial court made no findings in accordance with these factors.* Accordingly, the matter is remanded for further findings with respect to whether Austin or his company, or both, should be held liable for the cheese purchase. In all other respects, the judgment is affirmed.

WUEST, C.J., and MORGAN, HENDERSON and SABERS, JJ., concur.

KONENKAMP, Circuit Judge, sitting for MILLER, J., disqualified.

---

* The trial judge's memorandum opinion states that only Austin is liable, but the findings of fact and conclusions of law rule against both Austin and his company. Since the findings do not incorporate the memorandum opinion, we cannot consider it. *Hitzel v. Clark,* 334 N.W.2d 37 (S.D.1983).