No. 31,125

CLAY McKIBBEN, Appellant, v. REED BYERS, Appellee.

(25 P. 2d 357.)

Opinion filed October 7, 1933.

F. Dumont Smith, Eustace Smith and Claude E. Chalfant, all of Hutchinson, for the appellant.

Carl Van Riper, of Dodge City, and W. Raleigh Gough, of Kansas City, Mo., for the appellee.

The opinion of the court was delivered by

BURCH, J.: The action was one by plaintiff to recover his share of profits accruing from transactions with defendant relating to purchase and sale of land. The petition disclosed relations between the parties with respect to two tracts only. The answer disclosed relations with respect to eight other tracts, and an accounting became necessary. The court stated the account, found a balance due defendant, and rendered judgment accordingly. Plaintiff appeals.

The petition was filed in August, 1930. The answer, which contained a counterclaim, was filed March 28, 1931, and the reply was filed April 23, 1931. The abstract shows an amended petition filed June 22, 1931. The nature of the amendment is not disclosed. On April 1, 1931, plaintiff filed a written motion for reference of the cause to a referee for trial. The motion was denied, and the trial was before the court. The trial commenced on June 8, 1931. There were some continuances, and the trial was concluded on January 10, 1932. On February 15, 1932, the court submitted what was called a statement of the McKibben-Byers account. This statement consisted of a sort of balance-sheet summary which showed plaintiff indebted to defendant in the sum of $11,393.10. Nobody could tell how or why the court arrived at the items of the statement, or what

the court's views might be with respect to various law questions necessarily involved in stating the account. On March 7, 1932, plaintiff filed a motion requesting clarification of the tentative findings, and filed a motion requesting certain conclusions of law. On March 12 the motions were denied except as to a portion of one of them, the statement of account referred to was placed on file, and judgment was rendered in favor of defendant against plaintiff for $11,393.10. A motion for new trial was duly filed, and overruled. On September 8, 1932, four days before time for appeal expired, plaintiff served notice of appeal. On September 21, 1932, the journal entry of judgment, containing the court's findings of fact, was filed. It occupies 38 printed pages of the abstract.

As indicated, the controversy arose over dealings regarding land. Plaintiff resided in Dodge City, Kan., and for some years previous to 1917 was engaged in the general real-estate business, buying and selling real estate, both on his own account and as agent or broker for others. Defendant was an investor who resided in Kansas City, Mo. The petition pleaded an oral agreement that whenever plaintiff found land he considered a bargain, defendant would finance the purchase, take title in his own name, and when the land was sold the profit would be divided equally between plaintiff and defendant. The answer pleaded an oral agreement that plaintiff would discover and investigate opportunities for acquisition of tracts of land, report to defendant, and if defendant approved, defendant would furnish the money and take title in his own name; plaintiff would oversee and manage improvement and operation of the land, all revenue to be property of defendant; plaintiff would exercise diligent effort to find purchasers for the land; when a purchaser on terms acceptable to defendant was found, the land would be sold; as compensation to plaintiff for his services rendered in acquiring, holding and selling the land, defendant would pay plaintiff one-half the net profit, computed according to a method described.

There is no testimony purporting to give the facts concerning what occurred which led to plaintiff and defendant having relations regarding land. Tracing the relations historically, in 1916 or 1917 they arranged to purchase about 52 quarter sections of land in Baca county, Colorado. Before that they had no agreement or understanding about handling land. Defendant testified the agreement with reference to that land was, they would buy the land together,

defendant would furnish the funds and take title, and net profits were to be divided equally. Net profit was to be computed by taking out interest on mortgages on the land, taxes, abstract and incidental expenditures, and six per cent interest to defendant on his investment. The land was raw, unfenced, scattered land. There was nothing to be done in the matter of looking after it, except to sell it, and there was no further agreement respecting it. The arrangement did not contemplate improving the land, or using it for farming or ranching, but was confined to buying and selling the land.

Subsequently other tracts of land were purchased, and the relations of the parties broadened. Raw land was fenced, and other improvements were made. One tract was hay land, and hay was cut each year. Improved land was purchased, and it became necessary to procure tenants, look after crops, market crops, and in general to conduct farming operations. The result was, there came into the relation of the parties the new element of use of land pending sale, involving management, income and expenditure, not foreseen or considered when the relation concerning the Baca county land was formed.

Defendant testified he was in full active charge of use of land, and plaintiff was resident supervisor. Part of the time it might have been as nearly descriptive if defendant had said he was non-resident supervisor, with plaintiff in active charge. Plaintiff testified he did nothing except what defendant directed him to do. This was true in a general sense, but there was undisputed evidence that he in fact exercised independent judgment and discretion with respect to important matters. The testimony of each with respect to division and comparison of function is not important, because it is clear what acts each one performed. These need not be detailed.

Considering the evidence realistically, uncolored by legal theory, and uncolored by fudging statements and conclusions designed to sustain or oppose legal theory, the actual relations between the parties were simple enough. Plaintiff discovered land, which was purchased and held to be sold. Defendant furnished the purchase money and other money necessary to finance the project, and took title. When plaintiff found a buyer and the land was sold, defendant's expenditures and interest on his advancements were deducted, and the net profit was divided equally. When the relation-

ship was extended to meet new conditions, the parties agreed respecting the conditions. Defendant advanced funds and took title as before. From gross receipts, which included income from land, expenditures by and interest to defendant were deducted as before, and net profit was divided equally. Whenever a new tract was purchased there was an understanding with respect to how it would be handled, and that it was purchased under the plan pursuant to which plaintiff and defendant had been operating. Ultimately there was an agreement that loss on one venture might be deducted from profit on another.

In presenting the appeal the parties are not content to accept the facts and discuss legal consequences on the basis of actualities of the relationship. The facts must be cast into some legal mold having a recognized name, and rights and liabilities must be deduced from the name. Plaintiff says the relation was one of joint adventure. Defendant says the relation was one of master and servant. The district court in effect adopted the method of the parties and the theory of defendant. The court found that defendant Byers employed plaintiff McKibben to assist Byers in the acquisition, holding and disposition of various tracts of land in Kansas, Oklahoma and Colorado, and as compensation for McKibben's services, Byers agreed to pay McKibben one-half the net profits realized by Byers. McKibben thus became Byers' hired man, who was to get a share of what Byers made.

There is no substantial evidence to sustain the court's finding. The business of buying and selling land, and later buying, using and selling land, was not Byers' business alone. McKibben was associated with Byers in the business. McKibben put in his effort as an experienced real-estate man, and later his effort as supervisor in the field. Byers put in his money, and later his managerial effort. The combination was designed to produce a profit, which the contributors were to divide. While Byers held title to land, and McKibben had no interest in the sense of owner, McKibben had a power over every tract purchased. Every tract was bought to be sold, and when McKibben produced a purchaser, Byers could not stand on his rights as owner and refuse to sell. If his refusal were arbitrary or unfair, McKibben was privileged to treat him as converting to his own use the source of mutual profit. While money received by Byers from use of land was his money, when a land transaction was closed and a balance was struck showing a profit, McKibben shared

that profit, not as a wage due from Byers, but as a product of the enterprise.

It might be a matter of interest to compare the status of the parties with that of partners, joint adventurers, principal and agent, master and servant, etc., but it is neither desirable nor proper to force the relationship into any of the standard categories. Justice will be accomplished by maintaining fidelity to the facts; and in any event, the elaborate findings of fact were framed on the basis of a relationship which did not exist.

After the trial, and while all plaintiff knew was that judgment against him for a large sum was impending, he requested certain declarations of law. The first and second follow:

"1. I find that the relation of the defendant to the plaintiff in the transactions involved in this case was that of trustee to the plaintiff who was *cestui que trust,* it appearing that the defendant had the sole possession and control of all the property and funds involved herein and was bound to account to the plaintiff for any profit from the various transactions. That he occupied the position of trustee, and as such was held to the utmost good faith and fair dealing with the plaintiff and bound from time to time to make proper and full statements of the various trusts.

"2. I find that the burden of proof throughout this case is on the defendant to prove all disbursements or payments made on account of the transactions here involved by preponderance of the evidence, and by the best evidence available. The plaintiff is not bound to prove that payments in question herein were not made, but the defendant must prove the same before he receives credit for them."

When the facts of the relationship have been ascertained, the law imposes certain duties upon Byers. He had title to the source of all revenue; he paid and received all money; he was headquarters man at Kansas City, Mo., and kept all the accounts; and his first duty was loyalty and good faith.

Confusion in the law results from inaccurate terminology. The term "trustee" applies primarily to transactions in which a settlor transfers property to a trustee for the benefit of a third person, the beneficiary. The term, however, has been freely used by the courts for the purpose of indicating fiduciary and confidential relationships in which trusteeship proper was not involved. Defendant was a trustee for plaintiff in the common and popular sense that defendant bore a fiduciary relation to plaintiff. Such a relation does not exist between employer and employee. If the employee is to be paid from a share of profits, the business must be fairly conducted to make a

profit, and an incidental accounting may be had to ascertain profits. But generally, relation of employer and employee is governed by legal principles, while fiduciary relationship is governed by equitable principles. In denying plaintiff's first request, the court evidently did not stand on phraseology, but on the fact McKibben was hired by Byers to assist Byers in Byers' business, and was to be paid out of Byers' profit. In such cases the burden rests on the employee to show the amount of profit.

Byers rested under a duty to McKibben to keep and render clear and accurate accounts with respect to conduct of the business in which they were engaged. The burden of proof was on Byers to show he was entitled to each credit he claimed. Mere failure to keep proper accounts and to preserve vouchers may result in failure to establish claimed credits; and failure to produce vouchers may require application of the presumption that if the best evidence were produced it would be against allowance of the credit.

The court found that the various transactions between the parties had been kept and regarded by them as one mutual, open, running, continuous account. The finding gives a cast to the keeping of accounts by Byers not warranted by the evidence.

Byers kept books. Years ago McKibben would from time to time ask for an accounting. He was frequently in Kansas City. Byers would show him how the books were kept; they would go over them, and Byers would show him debits and credits. At that time most transactions were unclosed, and the question was investment and expenditure. Byers had correspondence with McKibben relating to how McKibben stood, and Byers made some statements, the nature of which was not disclosed. Byers told McKibben any time McKibben was in Kansas City they could go over the books, and Byers would show him in detail how the account stood. In recent years McKibben did not make any demand for a general accounting. These are the facts according to Byers' testimony. There is indisputable evidence that in May, 1924, McKibben suggested to Byers that they "square some day," and that in May, 1925, McKibben asked for a statement concerning the Guymon ranch.

The books reached such a condition that the expert accountants employed by the parties could not agree. Under a contract between the parties, loss on one tract was chargeable against profit on another, and there can be no doubt that whenever the transactions relating to one tract were closed, Byers rested under a duty, growing

out of his relation to McKibben, to render McKibben an account with respect to that tract. That was never done.

There was fair ground for holding Byers to strict proof. He inserted in his cross petition an utterly groundless claim against McKibben for $25,000, when the proof of falsity of the claim was in his own knowledge and possession. That was his attitude when called to account. The books themselves were not correctly kept, to McKibben's prejudice. Item: The sum of $1,526 on which interest amounting to $1,274 was claimed. Item: On the farm books of one tract, Byers' interest was carried as a half interest, and McKibben's interest as half of that, or one-fourth. Byers acquired another one-fourth interest, but he concealed the purchase, and presented to the court an audit of his own books which showed Byers' interest to be one-half, instead of three-quarters. Item: The sum of $4,052.12 for which no voucher could be produced, and which Byers could not explain. This item was allowed by the court on conjectures of Byers respecting what it was for.

The transcript is voluminous, and only a part of the record is before the court. The court does not propose to review the proceedings generally. The district court had a conception of the case fundamentally wrong, and this court is satisfied the erroneous view affected the decision.

The district court stated the account as of December 18, 1931, as near to the time of final decree as possible. This is the rule in a variety of accounting cases, but the rule was not applicable to the facts of this case. The answer alleged that since the year 1919 plaintiff and defendant had treated their agreement as virtually at an end, and had totally abandoned it. There was no truth in the allegation, but there was a discontinuance of relations previous to commencement of the suit. The petition was filed on August 17, 1930, and the relation of the parties under their previous agreements was definitely and indisputably ended on that date. McKibben had no further power over unsold land in Byers' possession. Whatever Byers did with it was on his own account, and of no concern to McKibben. Byers was not obliged to account to McKibben for profits on subsequent sales, or profits from subsequent use of land or chattels, and Byers had no privilege to charge McKibben with subsequent expense, depreciation, or loss. Therefore, the account should have been stated as of the date of filing the petition. For reasons

which need not be set forth at length, these observations apply to the unsold portion of the Minor ranch.

The district court stated the following finding:

"That, under the original contract between plaintiff and defendant, the business was to consist of buying and selling of lands and fitting them for sale by proper improvements necessary to the sale; that it did not involve or contemplate any dealing in live stock or any other kind of business except the buying and selling of land; that subsequently, as lands were acquired, the contract was modified by mutual agreement and understanding that, while the lands were being held for resale, they should be used and such farming and ranching operations as were adaptable to said lands should be carried on thereon, in an effort to realize a profit from said lands while being so held."

As indicated, the "original" contract related to the Baca county land, and did not include any agreement with respect to fitting it for sale. That contract never was modified by any general agreement that while lands were held for resale they should be used for farming or ranching operations to which they were adapted, in an effort to realize a profit. There were agreements with respect to what should be done with particular tracts. To illustrate: When the Guymon, Okla., land was purchased, there was a definite agreement that it would be fenced and some wells would be dug, with the idea of making it a cattle ranch.

Byers testified concerning the agreement respecting the Powell ranch as follows:

"Q. Aside from division of profits after returning to you your investment and expenses, interest and so on; aside from the interest Mr. McKibben would have in each transaction, were there any other additional arrangements, additional conditions, put in your contract? A. Yes, there was.

"Q. When was that done? A. Well, when we took over the Powell ranch.

"Q. What year was that? A. 1918 I think.

"Q. What was that agreement? What did you do then? A. That was a piece of ground that was improved more or less; it was hay land, and had, I don't know, I think—and the hay was cut every year, averaged from three to four hundred tons of hay, and we had an agreement whereby Mr. McKibben was to look after that place in that he was to see that we had—I don't know, make an effort to lease the place, know what the crop was, handle, take charge of the measuring of the hay, report to me what it was, possibly sell the hay from year to year, look after the new tenants on the place. . . .

"It was understood that he was to share in the crops as they came in, that was to be credited to the hay ranch; any crops that came in were to be credited; he would share in the crop in that way; his share would be one-half of the crop.

"Q. That would be considered income from the land? A. That would be considered income from the land."

McKibben looked after the Powell ranch for several years. In 1922 an offer to purchase at a satisfactory price was received, but the deal was not consummated.

Hay became unsalable on account of the state of the cattle business, a tenant on the ranch was about to leave, and in 1929 Byers spent $10,768 in the purchase of sheep, which were placed on the ranch. Baled hay was used to make sheep sheds and pens, and hay was fed to the sheep. Late in the trial Byers disclosed for the first time a claim for loss on the sheep transaction. Byers testified as follows:

"Q. Before you went into the sheep speculation, did you consult with McKibben, get his consent? A. No, sir.

"Q. He didn't know anything about it? A. I don't know whether he did or not.

"Q. You didn't report it to him, did you? A. No, sir.

"Q. Never gave him any account of the sheep transaction? A. No, sir.

"Q. Why didn't you report this sheep transaction as far as it had gone in the audit of October 1, 1930, on your ranch? A. It wasn't my habit to report any of my operations to him on any of the tracts of land; that wasn't my custom, habit, or practice, in any way to report how I was operating the places.

"Q. You expended money on the place after that time? A. Certainly.

"Q. For instance, take the Minor ranch, you close that as of October 1, 1930; you gave your expenses from January 1, 1930, down to October 1, 1930, showing a loss of about $4,000; you take an inventory October 1, 1930, for the stuff you had on hand; why didn't you do the same thing with the Powell ranch? A. Because I had the Powell ranch those—the sheep at that time—when this audit was made, had been on hand such a short time that it was practically—I thought no object in taking an inventory, I wouldn't want to buy sheep at one time and take an inventory in two or three months.

"Q. That the only explanation you want to make to the court? A. That is the only explanation there is."

The court made the following finding:

"The court finds that the stocking of said lands with sheep was within the modified terms of the contract between plaintiff and defendant as hereinbefore set forth, and that the losses on the handling of the sheep is a proper charge against the profits of the transactions carried on under said contract; but at the request of the plaintiff the court finds that the losses incurred in the handling of said sheep on the Powell ranch was and is the sum of $7,934.87, one-half of which is charged against the plaintiff's share of the profits of the transactions carried on under said contract."

The finding that stocking the land with sheep was within the modified terms of the contract between the parties was in accordance with the finding of a general agreement that lands were to be used for purposes for which they were adapted. There was no such agree-

ment. The agreement upon which the Powell ranch was purchased and operated has been set out above. The result is, a share of the loss on the sheep transaction could not be charged against McKibben on the ground stated by the court.

The court found that Byers in good faith endeavored to make the handling of the sheep and use of hay and pasture profitable, but because of adverse conditions loss resulted. What he should have done was to act in good faith with McKibben in going into the sheep business. He did not base his conduct on the fact his contract with McKibben was at an end. In that event he purchased the sheep on his own account. He deviated from the contract with McKibben in utter disregard of McKibben, and if he had made money on wool and mutton he was in a position to account to McKibben for appropriation of unsalable hay.

The authorities with respect to deviation by a trustee are not harmonious, and it is not necessary to review them here. In this instance there was no emergency requiring Byers to act quickly. He did not pretend that anything stood in the way of consulting McKibben about converting the ranch into a sheep ranch. He made no effort to secure McKibben's consent, and he was utterly indifferent to what McKibben's attitude toward the project might be. After he had expended a large sum of money in a speculative enterprise, he gave McKibben no opportunity to approve or disapprove. He closed an audit of his books to be used in aiding the court as of October 1, 1930, without showing the sheep account, which originated in 1929. The audit was presented in court on June 22, 1931. In December, 1931, he proposed to charge McKibben with half the loss. There are good grounds to believe Byers always regarded the sheep transaction as his own affair. In any event, his conduct was such that, as one occupying a fiduciary relation, he had no standing in equity to charge half the loss to McKibben, and in the accounting the sheep venture should have been disregarded.

The nature of the case is such that this court cannot correct the findings generally and order judgment. A new statement of the account is necessary, which shall be arrived at in accordance with the views respecting the facts and the views respecting the law which have been announced. In the accounting the parties shall be confined to transactions embraced in the former accounting. Items not determined by what has been said are open to fresh investigation.

The judgment of the district court is reversed, and the cause is remanded with direction to proceed as indicated.