Sammy **KAYE** and David Krengel, Appellants,

v.

L. C. **SMITHERMAN** and Simon Cohen, Appellees.

L. C. **SMITHERMAN** and Simon Cohen, Cross-Appellants,

v.

Sammy **KAYE** and David Krengel, Cross-Appellees.

Nos. 4916, 4917.

United States Court of Appeals Tenth Circuit.

July 18, 1955.

Rehearing Denied Sept. 7, 1955.

1. Ibid., 207 F.2d 920, Italics added.

Wayne Coulson, Wichita, Kan. (Howard T. Fleeson, Homer V. Gooing, Paul R. Kitch, Dale M. Stucky, Wichita, Kan., Lee V. Eastman, New York City, were with him on the briefs), for appellants and cross-appellees.

John F. Eberhardt, Wichita, Kan. (George B. Powers, Samuel E. Bartlett, Carl T. Smith, Stuart R. Carter, Robert C. Foulston, Malcolm Miller, Robert N. Partridge, Robert M. Siefkin, Wichita, Kan., J. B. McKay, James B. McKay, Jr., El Dorado, Kan., were with him on the briefs), for appellees and cross-appellants.

Before PHILLIPS, Chief Judge, and BRATTON and HUXMAN, Circuit Judges.

PHILLIPS, Chief Judge.

This is an equitable action brought by Sammy Kaye and David Krengel,[1] members of a joint adventure, to impress a constructive trust upon certain oil and gas leases acquired by their co-adventurers, L. C. Smitherman and Simon Cohen,[2] and to seek an accounting with respect thereto.

Kaye, who is in the music business, and his business manager, Krengel, were interested in engaging in oil ventures. Sometime in May, 1951, Kaye became acquainted with Walter H. Helmerich, president of both Helmerich & Payne, Inc., and its affiliate, White Eagle Oil Company. Their acquaintance ripened into a warm friendship. It was Helmerich's desire to enable Kaye to participate in oil ventures which might prove mutually profitable to Kaye and Helmerich & Payne, Inc. Helmerich introduced Kaye to Erik K. Waering, chief geologist for Helmerich & Payne, Inc. Whereupon, Waering became Kaye's adviser and agent in subsequent oil negotiations and actively advised him with respect thereto on many occasions.

In June, 1951, at Hutchinson, Kansas, Kaye met Smitherman. Cohen was a partner in the Smitherman & Cohen Drilling Company, of El Dorado, Kansas. Kaye was not acquainted with and had no direct contacts with Cohen. At the time of such meeting, Smitherman informed Kaye that he was in the oil business. At that time, Kaye requested Smitherman to let him know if any deals arose in which he might want outside

---

1. Hereinafter referred to collectively as plaintiffs.

2. Hereinafter referred to collectively as defendants.

capital, as he would be interested. Smitherman subsequently submitted a number of propositions, all of which Waering checked, and one of which Kaye accepted. All of the wells drilled in that venture were dry.

Helmerich & Payne, Inc. were joint owners with the Freeport Sulphur Company of a contiguous block of leases covering 1,040 acres, of which 800 lay in Cowley County, Kansas, and 240 in Kay County, Oklahoma. In January, 1951, Helmerich & Payne, Inc. and the Freeport Sulphur Company drilled a dry hole on one of the leases in Kay County. However, the leases were kept in effect.

On August 30 or 31, 1951, Waering telephoned Kaye in New York, described the above block of leases, and stated that his company wanted development in that area. He told Kaye that there was production three-quarters of a mile to the south, that the geology was good, and that they would pay $1 a foot dry hole money for an offset, making it a cheap deal for Kaye. Kaye replied that he would take any deal that Waering recommended. Waering went on to explain that Kaye would have to take someone in with him as Helmerich & Payne, Inc. could not put up dry hole money and also do the drilling. Kaye told Waering to offer Smitherman half of the deal. On the same day, Krengel acquired one-third of Kaye's one-half interest in the venture.

A few days after Waering talked to Kaye, Smitherman telephoned Waering in regard to a lease in which Kaye had taken an interest. During this conversation Waering told Smitherman that Helmerich & Payne, Inc. and the Freeport Sulphur Company were the owners of a large block of leases in Cowley County, Kansas, and Kay County, Oklahoma; that it contained a stratigraphic trap and was an attractive area; that Helmerich & Payne, Inc. would pay $1 a foot dry hole money for an offset; that Kaye would go in as a 50–50 partner and had asked Waering to offer equal participation to Smitherman. Smitherman replied that he was interested and would

come down as soon as his rig was free. Smitherman said he had a Cowley County map, but asked Waering to send him a map of Kay County, which he subsequently did.

A few days prior to September 17, 1951, Smitherman telephoned Waering he was ready to start to work on the deal and that he would call upon him on September 18. Waering reported this conversation to Kaye and to Helmerich. On that date, Smitherman called upon Waering in the office of Helmerich & Payne, Inc., at Tulsa, Oklahoma. At this meeting, Waering produced a geological map, which he used to give Smitherman a detailed explanation of the geology of the area in which they were interested in Kay County, Oklahoma, and Cowley County, Kansas. The two counties adjoin each other. The map contained contour lines connecting the top of the Mississippi Limestone formation as indicated by the logs of all wells which had been drilled in that area; it showed the presence or absence of sandstone in all wells drilled and the thickness of the sand, where present; it showed the likely presence of a stratigraphic trap of Burbank Sandstone running in a northwesterly direction over the entire area. Waering explained the significance of this data. He explained what was meant by a stratigraphic trap and to illustrate his explanation he drew in front of Smitherman upon the map itself a pen and ink sketch of the sand pressed against the high. He explained that the fact that the well drilled by Helmerich & Payne, Inc. in Kay County, in January, 1951, was dry indicated that the trap lay to the west of that well. He further explained that the trap ran all the way from Section 33 in Kay County up through Sections 7 and 8 in Cowley County, and that it had to run west of the dry hole in the center of Section 8 in Cowley County. It extended well into the area embraced by the 914-acre block of leases referred to hereinafter. He discussed with Smitherman the data, including electric logs where available, on every well theretofore drilled in both

townships through which the stratigraphic trap extended, and pointed out the location of the Helmerich & Payne, Inc. block of leases, which was about in the middle of the area he described as containing the stratigraphic trap. He explained to Smitherman "that it was good all the way north," but told him that since production was already established in Section 20 in Kay County, he should get as close to it as possible. On a Kay County map he drew cross marks covering the North ½ of the Southwest ¼ and the West ½ of the Southwest ¼ of Section 17 in Kay County, and told Smitherman to see if he could not get a farm out on one or the other of those 80-acre tracts. He also pointed out Atlantic Refining Company's acreage adjoining and told him to see if he could not get dry hole money from them.

The disclosure of this confidential information by Waering to Smitherman on behalf of Kaye was for the use and benefit of the joint adventure.

After this meeting with Waering, Smitherman contacted G. L. Seibel, a lease broker and land man, to check into the availability of a lease on the West ½ of the Southwest ¼ of Section 17 in Kay County. Seibel was unable to procure this particular 80 acres, but did succeed in securing a farm out of the Conners Lease covering the East ½ of the Northeast ¼ of Section 18 in Kay County. Seibel's services were paid one-half by plaintiffs and one-half by defendants. In the latter part of September, Smitherman informed Waering that he had been unable to secure a lease on the Southwest ¼ of Section 17, but that he had secured the Conners Lease in Section 18. Waering told him that it would suit both Helmerich & Payne, Inc. and Kaye just as well. While Smitherman had not imparted to Seibel any information as to the geology of that particular area, Seibel during the course of his negotiations in behalf of Smitherman learned that the leases for which he was negotiating were regarded as extremely valuable and that Smitherman proposed to drill a well in the area. All of Seibel's knowledge, however, did not result by reason of his agency for the joint adventure. Seibel was an exponent of a geochemical method of locating the presence of subsurface oil in place. Essentially this method consisted of transporting chemicals in glass vials over the surface of the area and interpreting the resultant chemical changes. Seibel was convinced by his own investigation of the presence of subsurface deposits of oil in that locality. Acting on the information gained from his investigation and his lease negotiations, Seibel procured a lease on the East ½ of the Northwest ¼ of Section 17, Cowley County, Kansas, known as the McKay Lease. After the negotiations for the McKay Lease had started, but prior to its execution, Seibel telephoned Smitherman on September 27 and told him he had arranged for the McKay Lease and could get leases on the adjoining Stacy eighty, the Klink Scott quarter immediately north of the two above-mentioned leases, and the Blatchford quarter immediately east of the Klink Scott quarter,[3] and further that the leases were so situated that Smitherman could get good dry hole money. He telephoned Smitherman again a time or two before Smitherman went down to look the area over on October 2 or 3.

In the interim between the time Seibel first telephoned Smitherman and October 2 or 3, when Smitherman first visited the area with Seibel, and on about October 1, 1951, Smitherman telephoned Waering in regard to the 480-acre block. In this conversation, Smitherman told Waering he had been able to get 400 acres in Cowley County offsetting the White Eagle block; he described the McKay eighty, Stacy eighty, Blatchford quarter, and the West ½ of the Klink Scott quarter; he omitted to mention the East ½ of the Klink Scott quarter, for which he was negotiating, which is hereinafter sometimes referred to as the "hold out eighty." He also asked that

---

**3.** These leases are hereinafter collectively referred to as the 480-acre block.

the Conners Lease in Kay County be expanded to a two-well deal with $2 per foot dry hole money for him and Kaye on a well in the southeast corner of the McKay eighty. Waering expressed his approval of this proposition, but told him he would have to report to Kaye. Waering expressed doubt as to whether he would be in a position to give as much as $2 per foot. Smitherman said he would like to drill the Cowley County well first. Waering replied that since both leases were part of the same geology, it made little difference which was drilled first. Waering reported the conversation to Helmerich and talked to him about the amount of dry hole money.

Following this conversation, and on October 2 or 3, Smitherman accompanied Seibel to the McKay Lease. Seibel showed Smitherman a map indicating White Eagle as owner of the offset acreage. Smitherman said he was acquainted with them and thought he could get support money. He told Seibel he would take the deal and give him a 1/16th overriding royalty and directed Seibel to go ahead and get leases on the Klink Scott and Blatchford quarters and on the Stacy eighty, the remaining leases in the 480-acre block.

On October 8, Waering reported to Kaye that Smitherman had been able to get 400 acres in Cowley County; that Helmerich & Payne, Inc. would pay $5,000 dry hole money on the Cowley County well and that the deal had been expanded to include the drilling of two wells. Kaye said he would rely on Waering's recommendation and to count him in. The following day Waering reported to both Smitherman and Smitherman's wife that he had talked to Kaye and that everything was progressing satisfactorily "on the Sammy Kaye deal."

That same day, October 9, Seibel and the defendants entered into a written contract under the terms of which the defendants contemporaneously reimbursed Seibel for the $1 per acre paid the landowners and further agreed to drill a well on the McKay Lease, and in return Seibel agreed to assign the McKay, Stacy, Blatchford, and Klink Scott Leases comprising the 480-acre block to the defendants, subject to his 1/16th override. The standard contract form was altered to provide that even if the defendants did not drill the well, they were still entitled to assignment of all the leases, except the McKay Lease.

On October 10, Smitherman prepared separate contract letters for Kaye, one describing the Conners Lease in Kay County, Oklahoma, and the other describing 400 acres of the 480-acre block in Cowley County, Kansas. The latter contract mentioned only the West 1/2 of the Klink Scott quarter and omitted to mention the East 1/2 thereof, thereby "holding out" that particular 80 acres from the contract negotiations. Kaye's acceptance of the contract letters was dated November 1, 1951, but they were not returned to the defendants until November 14, 1951.

Over a long period of time Smitherman had received financial support from Frank and Ronald Rice, who had taken interests varying from 1/4 to 1/2 in some 40 or 50 of his drilling ventures. Sometime in October, 1951, Smitherman showed the area to the Rices and told them that it was a two-well deal, one-half of which was owned by Sammy Kaye. He told them that he had 80 acres in Oklahoma (the Conners Lease) and 400 acres in Kansas, referring to the 480-acre block. They first learned that he had concealed his ownership of the East 1/2 of the Klink Scott Lease after the McKay well had been drilled. Smitherman made no mention of the geological information he had received from Waering and disparaged the prospect of securing a well. The Rices finally took a total of 1/8, rather than their usual 1/4 to 1/2.

Drilling of the McKay No. 1 was commenced October 17, 1951. Between that date and October 23, Seibel secured leases on nine tracts of land to the north and west of the 480-acre block acquired prior thereto; they were the Bergkamp, Scott, Mulvaney, Richardson, Moore, G. H. Brown, Tibbets, E. B. Brown, and Broce, containing approximately 914 acres, all in

Cowley County. This block adjoins on the north the previously acquired 480-acre block with a common boundary 3,630 feet long. Seibel paid nothing for the leases at the time, all of them being placed in escrow. The securing of these leases was not disclosed to the plaintiffs.

From a drill stem test and an electric log run on October 30, it was known that McKay No. 1 was a good well. Following the drill stem test, L. E. Fitts, Jr., who had been sent by Helmerich & Payne, Inc. and Waering, in particular, as geologist on the McKay No. 1, told Smitherman that based upon his experience it was his opinion that there was a good-sized oil field there, which would extend an unlimited distance to the north.

On November 5, Smitherman entered into a contract with Seibel in relation to the 914-acre block previously mentioned. The contract provided for the payment by the defendants of the $614 necessary to get the leases out of escrow, plus $500 to Seibel in reimbursement for expenses, the drilling of a well on the Bergkamp Lease prior to January 12, and the assignment of the leases by Seibel to the defendants, reserving an overriding royalty of $\frac{1}{16}$th. None of these facts were disclosed to plaintiffs. For the reasons hereinafter indicated we have concluded that Smitherman only acquired a one-half interest in the leases covering the 914-acre tract.

With the exception of the Broce Lease, the leases in the 914-acre block were removed from escrow on November 13, 1951. With the exception of the Bergkamp Lease, the assignment of which was recorded on December 26, all of such leases and assignments to the defendants were withheld from record until after the drilling of Bergkamp No. 1. The Bergkamp Lease, the northernmost lease in the 914-acre block, was three-fourths of a mile from the nearest point on the original 480-acre block and three miles from the McKay No. 1 well.

At about the time drilling was commenced on McKay No. 1, Smitherman sent Seibel out to get a third group of leases. These were the Stacy forty (NE $\frac{1}{4}$ NE $\frac{1}{4}$ S 18) and the Allen forty (SE $\frac{1}{4}$ NE $\frac{1}{4}$ S 18). Between the time McKay No. 1 came in on October 30 and December 6, Smitherman sent Seibel out to acquire a fourth group of leases. They were the Klink Scott No. 2 eighty (E $\frac{1}{2}$ SE $\frac{1}{4}$ S 7), Cullers forty (NW $\frac{1}{4}$ SE $\frac{1}{4}$ S 18), Whyte eighty (W $\frac{1}{2}$ SE $\frac{1}{4}$ S 7), and west Stacy eighty (W $\frac{1}{2}$ NE $\frac{1}{4}$ S 18). All of the leases were taken in the name of Seibel and subsequently assigned by Seibel to the defendants. The entire 360 acres comprising these last two groups of leases adjoined the 480-acre block on the west. None of the facts involved in these transactions were disclosed to the plaintiffs.

On November 25 and 26, Krengel visited the area. At that time he asked Smitherman whether they could not pick up any additional acreage and was told by Smitherman that Helmerich & Payne, Inc. had it all tied up. At that time Smitherman had already acquired every lease in controversy, except the west Stacy eighty, but had made no disclosure of this fact to either Kaye or Krengel.

On December 13, in the defendants' suite at the Mayo Hotel, in Tulsa, Smitherman told Waering that he had picked up a couple of eighties west of the McKay. Waering told him he would have to let Kaye have his half. Smitherman said he would do so.

On January 4, 1952, Waering received from Mid-Continent Map Company, of Tulsa, a revised map of Cowley County. That map revealed that Smitherman had secured leases on 360 acres adjoining the original 480-acre block on the west and revealed that Smitherman also acquired, but had held out, the E $\frac{1}{2}$ of the Klink Scott Lease covering the SW $\frac{1}{4}$ of Section 8 and located in the very center of the original 480-acre block. Prior to receipt of the map, neither Waering nor the plaintiffs had any knowledge of the defendants' ownership of any of these leases. Waering immediately wrote to Kaye advising him of his discovery, enclosed a map, and stated he would see to it that Smitherman gave up the half interest to which Kaye was entitled. Later

that same day, Smitherman telephoned Waering about a well he was to drill under contract for Helmerich & Payne, Inc. Waering immediately demanded for Kaye his half interest in the leases last referred to above. Smitherman said: "Erik, you know I intend to take care of the boys all the way anyway. I intend to do right by the boys, don't worry."

Krengel arrived in Tulsa on January 11, 1952, and accompanied by Waering drove to Arkansas City, Kansas, where the next day they talked to the defendants and demanded a half interest in the 360-acre block and in the withheld Klink Scott eighty. A further discussion with Smitherman took place the following morning. Smitherman put his arms around Krengel and said, "I will come down to Tulsa tomorrow. We will get it all squared away."

With the exception of the Bergkamp Lease and assignment, all the other leases and assignments to the defendants in the 914-acre block were filed for record between January 3 and January 26, 1952.

The Mid-Continent map received by Waering did not reveal the ownership by the defendants of the Broce, Moore, G. H. Brown, E. B. Brown, Scott No. 2, Mulvaney, or Richardson Leases. It did reveal their ownership of the Bergkamp Lease. Located as it was, three-fourths of a mile from the nearest point on the original block and three miles from the McKay No. 1 discovery well, there was nothing about that lease to indicate a connection with the original block. The earliest date that even a physical connection between the Bergkamp Lease and the original block could have been discovered, was January 26, 1952, when the assignment to the defendants of the Broce Lease was recorded. The Broce Lease closed the three-fourths mile gap between the original block and the Bergkamp Lease on the north.

Prior to the filing of the suit on February 14, 1952, three wells were completed on the 914-acre block in addition to the McKay No. 1 in the 480-acre block completed October 30, 1951, and all producing wells on both blocks are producing from the same formation at approximately the same depth.

None of the facts in relation to the acquisition of the 914-acre block by the defendants were disclosed or ascertainable by the plaintiffs until a deposition of Seibel was taken. The material facts thus disclosed included the fact that the leases had been collected into a block; that the opportunity to acquire the block arose out of Seibel's obligation to the defendants, by reason of the joint adventurers having drilled the McKay No. 1, and further the price paid and obligations assumed by the defendants in acquiring the block.

The plaintiffs were without knowledge of most of the facts constituting their claim against the defendants, and all of the facts necessary to an intelligent election as to whether to waive their claim to a one-half interest in the leases in controversy, namely, the 914-acre block, the 360-acre block, and the "hold out eighty," or to assert it and assume half of the burdens incident thereto. The plaintiffs timely filed their complaint in this cause on February 14, 1952, electing to share in the leases in controversy to the extent of their one-half interest therein and offering to assume their one-half share of the cost of acquiring, developing, and operating them.

On October 29, 1953, the court found that the relationship between plaintiffs and defendants was a joint adventure and fiduciary in nature; that the opportunity to acquire the leases was one belonging to the joint adventure, and that the defendants, Smitherman and Cohen, stood charged as trustees for the plaintiffs, Kaye and Krengel, as to a one-half interest in the leases in controversy. On November 4, 1953, the defendants filed a motion asking that the court find specifically the ownership of the various leases and to further find that the plaintiffs were entitled only to a one-half interest in what the defendants still retained after assignments of interests to strangers to the litigation. Counsel stipulated on the ownership of the leases, subject to plaintiffs' objection "that the

facts herein stated are outside the issues and plaintiffs' contention that the facts herein stated are not in evidence and their objection to the introduction of additional evidence at this late date, which objections are not waived."

The stipulation also revealed that all transfers or agreements to transfer interests in the Klink Scott "hold out eighty" and in the 360 acres to the west of the original 480-acre block, except for the Stacy eighty, were made after demand by the plaintiffs upon the defendants for a one-half interest therein. Some of the transfers were made pendente lite, subject to proportionate reduction if the plaintiffs prevailed in the lawsuit.

The court overruled the plaintiffs' objections, made an additional finding, and substituted new conclusions of law where pertinent, the effect of which was to reduce the plaintiffs' interest to one-half of the interest still owned by the defendants at the time suit was filed. The court made no distinction as to transfers made after demand by the plaintiffs for a one-half interest in the leases.

It is appropriate first to consider the cross-appeal in Number 4917. The defendants, Smitherman and Cohen, now acquiesce in the trial court's decree regarding the "hold out eighty" and the 360-acre block. They do challenge the correctness of the decree in so far as the 914-acre block is concerned, asserting for a reason therefor that it was acquired through independent transactions outside the scope of the joint adventure.

It is immaterial that Seibel either held or acquired the leases on the 914-acre block independently, if the defendants improperly utilized confidential geological information imparted to them for the benefit of the joint adventure and if the acquisition of the leases so obtained by them from Seibel was within the scope of the joint adventure. This, then, is the question to be resolved.

At the outset it is well to recall the geological characteristics of the 914-acre block in question. It is contiguous to the 480-acre block which offset the original Helmerich & Payne, Inc. holdings and which concededly was included in the adventure, with a common boundary 3,630 feet in length, so as to present a single block of leases without interruption.

The trial court found that "The subject of the joint adventure at the outset was the securing and developing with the aid of dry hole money from Helmerich & Payne of leases offsetting the Helmerich & Payne block. The acquisition and development of the 480-acre block was an integral part of the subject matter of the joint adventure. The acquisition and development by the defendants of every lease in controversy, except the Miller Lease, was a business opportunity which was the natural outgrowth * * * of the joint adventure which existed from the outset and was within the reasonable contemplation of the parties from the beginning."

The evidence clearly discloses that Kaye was possessed of a business opportunity offered to him alone by Helmerich & Payne, Inc. As a part of that opportunity, Helmerich & Payne, Inc. tendered confidential geological information and dry hole money. Instead of exploiting the opportunity by himself, alone, as he had a right to do, he chose to share the opportunity with Smitherman as a joint adventurer, with Smitherman as manager of the enterprise. When Kaye offered participation to Smitherman, it was not known what leases, if any, could be secured; what amount of dry hole money Helmerich & Payne, Inc. would agree to for what particular offsets, nor whether production would be obtained. The acquisition of the block of leases now in controversy was a continuation of the exploitation of that opportunity. The sharing of the opportunity did not restrict or reduce the scope of the opportunity. It is apparent from the record, and the trial court so found, that the 914-acre block was acquired in reliance on the geological information furnished by Waering and Fitts. All wells are producing from the same formation from approximately the same depth.

The defendants made no disclosure of the opportunity to acquire the 914-acre block, or of their acquisition of it. They withheld all of the leases, except the Bergkamp Lease, from record until after the drilling of Bergkamp No. 1. On November 25 or 26, 1951, Krengel asked Smitherman if they could pick up any additional acreage and Smitherman said Helmerich & Payne, Inc. had it all tied up, although the fact was that he and Cohen at that time had all the leases now in controversy. On two occasions, Smitherman promised Waering that he would "take care" of Kaye in regard to the "hold out eighty" and the 360 acres to the west of the 480-acre block.

■ The trial court found that each and every one of these failures to disclose, concealments, and misrepresentations "were all intended to and did prevent plaintiffs' discovery of the material facts constituting their claim against defendants until after suit was filed." The finding is not challenged, but it is argued that the defendants' intent to defraud is immaterial. Even if that were so, the defendants' construction of the scope of their adventure is not immaterial. Both parties construed their adventure to cover any leases obtainable in the area which they were engaged in developing. Under Kansas law their construction would have governed over even a written contract.[4]

■■ It is elemental that ordinarily the findings of a trial court on uncontroverted factual issues will not be disturbed on appeal unless clearly erroneous.[5] The trial court's finding that these leases were acquired in furtherance of the joint adventure is amply supported by the evidence.

The defendants further assert that the plaintiffs' inaction and failure to assert any claim until after the defendants had risked their capital and developed the 914-acre Bergkamp Block, in view of the knowledge which the plaintiffs possessed, or could by the exercise of reasonable diligence have ascertained, constitutes laches.

The trial court found that Waering in his capacity as an employee of Helmerich & Payne, Inc. and not in the capacity as agent for Kaye, knew of the drilling of the Bergkamp No. 1, although he did not know its exact location; and that Kaye knew nothing of the drilling of any of the wells until after suit was filed.

■ In the light of the evidence previously set out, it is clear that the plaintiffs were without knowledge of most of the facts constituting their claim against the defendants and of all of the facts necessary to an intelligent election as to whether to waive their claim to a one-half interest in the leases in controversy or to assert it and assume half of the burdens incident thereto. Laches cannot afford a defense, since the plaintiffs have at all times, after becoming aware of the deception, been diligent in the assertion of their claim.

Turning now to a consideration of the main appeal. The plaintiffs challenge the correctness of the trial court's order, the effect of which was to reduce their interest to half of the interest still possessed by the defendants at the time suit was filed, rather than awarding one-half of the latter's originally acquired interests prior to transfers to other individuals.

The parties hereto, after the entry of the original decree on October 29, 1953, and in response to a motion directed to the findings of fact and conclusions of law entered therein, stipulated as to the ownership of the various leases in controversy. This stipulation dated February 15, 1954, was entered into subject to the plaintiffs' objection that the facts stated were outside the issues and not in evidence and that the introduction of such additional evidence at that time came too late.

It is the position of the plaintiffs that the defendants were trustees *ex maleficio*, and as such lacked power to transfer the

---

4. Winter v. Miller, 10 Cir., 183 F.2d 151, 153, 154.

5. United States v. Chicago, R. I. & P. Ry. Co., 10 Cir., 171 F.2d 377, 380.

interests of plaintiffs as beneficiaries in the leases; that as joint adventurers the defendants had no authority to transfer the interest of their co-adventurers in the joint property; and, lastly, that there was neither pleading nor proof that such transfers to third persons of interests in the joint property were in furtherance of the joint adventure.

■ However, with respect to the leases covering the 914-acre block, we are of the opinion Smitherman acquired only a one-half interest therein and that the other one-half interest was acquired by the Rices. It is true the transaction was cast in the form of an assignment of such leases by Seibel to Smitherman and a reassignment of a one-half interest therein by Smitherman to the Rices.

We think, however, the evidence clearly established that before the assignments were made by Seibel to Smitherman, the latter and the Rices had agreed that the Rices would receive a one-half interest in such leases and that in substance and legal effect Smitherman acquired for himself only a one-half interest in such leases and that he acquired the other one-half interest in such leases for the benefit of the Rices and was obligated to reassign such one-half interest to the Rices.

■■ It is true that Smitherman and Cohen did not affirmatively plead that they only acquired a one-half interest in the leases covering the 914-acre tract, but evidence was introduced without objection relating to the time when, and the circumstances under which, the Rices acquired their one-half interest. No objection was made to that evidence on the ground that it was outside the issues in the case. Accordingly, the pleadings should be regarded as amended to conform to the proof. Hence, we conclude that Smitherman should account to Kaye

and Krengel for a one-fourth interest in the leases covering the 914-acre tract. It is true that the trial court reached its judgment on a different ground, but it is well settled that a judgment or decree which is correct in effect will not be disturbed on appeal, although predicated on an erroneous ground by the trial court.

■ By intentionally breaching their fiduciary obligation to plaintiffs, defendants became constructive trustees for plaintiffs' one-half interest in the leases in controversy from the date of their acquisition of each lease.[6] From that moment defendants became constructive trustees *ex maleficio*, of all the trust property, and were restricted in their dealings with the property to such duties as the law imposed upon them as such trustees.[7] By their repudiation of the joint adventure, so far as it related to the leases in controversy, the defendants lost their right to deal with the property as joint adventurers and were confined to the duties imposed by law upon them as constructive trustees. At the same instant, the plaintiffs became the equitable owners of an undivided one-half interest in such leases,[8] except the leases covering the 914-acre tract, and as to those leases they became the equitable owners of an undivided one-fourth interest.

■ Except as to bona fide purchasers for value, without notice, the plaintiffs and not the defendants were the real owners of such undivided interests. Any alienation of plaintiffs' interest by defendants would have been a wrongful act and the defendants may not assert authority to commit a wrong against the plaintiffs. When the defendants transferred interests in the leases to third persons they necessarily transferred their own and not the plaintiffs' interest.[9]

6. Cann v. Barry, 298 Mass. 186, 10 N.E. 2d 88, 89; Nelson v. Bailey, 303 Mass. 522, 22 N.E.2d 116, 120.

7. Petroleum Royalties Co. v. Hartford Acc. & Ind. Co., 10 Cir., 106 F.2d 440, 442, 443, 124 A.L.R. 1403, citing Cann v. Barry, supra.

8. Ohio Oil Co. v. Sharp, 10 Cir., 135 F. 2d 303; Oldland v. Gray, 10 Cir., 179 F.2d 408, 414.

9. Cascaden v. O'Connor, 9 Cir., 257 F. 930, 933; Dexter and Carpenter, Inc., v. Houston, 4 Cir., 20 F.2d 647, 653, 654.

The problems created by transfers of interests to good faith purchasers for value, without notice, are not here present. While it is true that certain interests were transferred by the defendants to other persons, at no time were more than their own interests so transferred. Whatever the defendants did with regard to their interest in the leases was of no legal concern to the plaintiffs as long as the latter's interest remained unimpaired; while dissolution of the joint adventure might result, the defendants were free to alienate their interest as they saw fit. The plaintiffs had no occasion or desire to litigate these issues with any of the transferees, nor was this matter ever in fact determined. The transferees were brought into the action by cross-complaint of the defendants who sought partition; subsequently on motion of the same defendants the action was dismissed as to such transferees some five months before the court filed its findings and conclusions on October 29, 1953.

■ The defendants' motion directed at the original findings and conclusions was founded entirely upon the premise that although defendants breached their fiduciary duty owed to plaintiffs and intentionally concealed their default in order to prevent discovery, they as joint adventurers still had the power to bind their plaintiff co-adventurers by assignments to strangers of interests in the subject matter of the joint adventure. This apparently upon the theory that such transfers were necessary to further the business affairs of the joint adventure.

It is the general rule that as between themselves a joint adventurer or partner of a non-trading partnership must have the express consent of his associates to

transfer anything more than his own interest in the joint property.[10]

■ All of the cases cited in the foregoing footnote indicate that one occupying a fiduciary relation must exercise the utmost good faith and candor in his dealings with the other party in regard to the joint property. This necessarily means full disclosure and consultation before the joint assets may be transferred or otherwise alienated. This statement applies with even greater force in the instant case, since the defendant, Smitherman, was the general manager of the enterprise.

■ In their answer to the complaint, defendants raised the general issue by their denial of the averments. They did not at that time raise any affirmative defense of authority upon their part to bind the plaintiffs by assignments to strangers. The first time that this contention was raised was by the filing of the motion directed to the pleadings and conclusions of law, dated February 15, 1954, some three and a half months after the entry of the original findings. It must also be borne in mind that the plaintiffs objected to this procedure on the ground that the facts as to the transfer of ownership interests were not in evidence and the introduction of such facts at that time came too late.

Rule 8(c) of the Federal Rules of Civil Procedure, 28 U.S.C.A., requires the pleading of "any other matter constituting an avoidance or affirmative defense." Rule 12(h) of the Federal Rules of Civil Procedure provides that defenses not raised by motion or answer are waived. We are not unmindful of the provisions of Rule 15(b) of the Federal Rules of Civil Procedure authorizing amendments to conform to the evidence. That rule is applicable, however, only when an issue has been tried by express or implied

---

10. Blaker v. Sands, 29 Kan. 551, 557, 558; McKibben v. Byers, 138 Kan. 216, 25 P.2d 357, 361, 362; State ex rel. Crane Co. of Minnesota v. Stokke, 65 S.D. 207, 272 N.W. 811, 819, 110 A.L.R. 761;

Swanson v. Webb Tractor & Equipment Co., 24 Wash.2d 631, 167 P.2d 146, 155; Meagher v. Reed, 14 Colo. 335, 24 P. 681, 691, 9 L.R.A. 455; 30 Am.Jur., Joint Adventures, § 43, p. 700.

consent of the parties.[11] The record here does not disclose such consent.

The cause is remanded with instructions to modify the decree in accordance with the views expressed in this opinion.

---

11. Simms v. Andrews, 10 Cir., 118 F.2d 803.